**UNIVERSAL INCORPORATED,**
Appellee,

v.

**KAY MANUFACTURING CORPORATION, Appellant.**

No. 8479.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1962.

Decided March 22, 1962.

Ralph L. Chappell, New York City (Norman Block, Greensboro, N. C., Harry Jacobson, Kenyon & Kenyon, New York City, and Block, Meyland & Lloyd, Greensboro, N. C., on brief), for appellant.

D. D. Allegretti, Chicago, Ill. (Will Freeman and Blair, Freeman & Molinare, Chicago, Ill., on brief), for appellee.

Before SOPER, BOREMAN and BELL, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought to enjoin infringement of United States Patent No. 2,480,667 issued on August 30, 1949 to William H. Neely upon an application filed February 21, 1944. The patent covers elongated corrugated wire springs for upholstered seat structures. The plaintiff is Universal Incorporated, an Ohio corporation, which is the assignee and owner of the patent. It has its principal place of business at Bedford, Ohio, and is engaged in the manufacture and sale of corrugated wire springs throughout the United States. The defendant is Kay Manufacturing Corporation, a New York corporation, with its principal place of business in Brooklyn. It is engaged in the same line of business as the plaintiff and for that purpose maintains a plant at High Point, North Carolina.

In the manufacture of cushioned seat structures, springs are mounted in parallel lines across an open frame with padding and an upholstery cover stretched over them. The specification of the patent, in its description of the patented spring, states at the outset that when assembled the spring "should be free of stiffness in localized areas and readily yield to the load applied when in use." To this end the patent discloses that the springs are elongated sinuously corrugated wires. Each spring comprises a body portion designated as the load supporting member with an attachment to the frame at one end, and a V-shaped supporting member for the body portion consisting of a short arm and long arm. The short arm of the V is coupled with an angular offset to the rear face of the supporting spring member between its ends, and the long arm is extended rearwardly of the body portion and attached to the frame. The result is a load carrying spring, supported at each end, from which a cantilever-like V-shaped portion extends rearwardly. The specification states that a spring so constructed will not be deformed when under load in the area in which the load bearing member and the supporting member are coupled together, but the latter will yield sufficiently to ensure full flexibility of the former so that it will properly contact the load and readily yield to its shape.

Figure 7 of the patent portrays the profile of the spring showing the load carrying member 26 and the V-shaped supporting member 27 with its short arm 38 and its long arm 37.

FIG. 7

Figure 1 of the patent displays the end spring fitted in the frame of the back of an upholstered chair. A series of the springs are placed side by side longi-tudinally in the back of the chair. In the seat of the chair two V-shaped spring supporting members are shown.

FIG.1

Claim 1 of the patent is as follows:

"1. A wire spring for cushioned seat structures comprising an elongated, sinuously corrugated body portion, and an independent V-shaped sinuously corrugated supporting portion for said body portion, said V-shaped supporting portion including a short arm and an arm of substantial length, the short arm including an angularly offset end portion engaged with the rear face of said body portion and rigidly coupled therewith between the opposite ends thereof, and the long arm being extended from said short arm rear-wardly of said body portion in spaced relation with respect thereto, said angularly offset end portion of said short arm effecting rearward spacing of the apex of said V-shaped supporting means from said elongated, corrugated body portion."

The defendant's product which is alleged to infringe, is designed for the same general purpose as the spring of the patent. It is constructed of corrugated wire springs mounted in parallel lines on a frame in the back of the chair. An end view of the defendant's spring is depicted in the following drawing.

The defendant's spring is made of a single strip of flat corrugated material. The back rest or load bearing member 4 and the supporting member 1 are integrated as one continuous piece but the latter is bent back and interlaced with the former so as to overlie it from the end to the point 3 where it passes across the back rest and is held by a clip. After passing through the clip it is bent to form a V-shaped member of which, as in the patented device, one arm is attached to the back rest and the other arm to the frame of the seat structure. The defendant's V is a continuation of the wire which forms the back rest and, therefore, is not literally within the terms of Claim 1 which speaks of "an independent V-shaped sinuously corrugated supporting portion for said body portion"; but the defendant's spring in effect has a V with a short arm that is the portion from Clip 3 to the apex of the V and a long arm proceeding thence to the frame.

The defendant's main argument seems to be that its structure does not infringe the patent. In presenting this contention the defendant relies in passing to some extent upon the structural differences in the competing products above mentioned. Having in mind the terms of Claim 1, the defendant says that it does not have an independent V-shaped supporting member composed both of a short arm, which includes an offset portion rigidly coupled with the rear face of the load bearing member and also a long arm extending rearwardly of the load bearing member. Defendant argues that its V is not independent of the body portion but is integral with it in that the long arm of the V is interlaced with the body portion and runs to the upper end thereof and returns above and not under the face of the body portion. Defendant says also that one arm of its V is attached or clipped to the body portion at a single point and does not have an offset as does the short arm of the V of the patent.

In our view these differences are immaterial to the question of infringement. For the purposes which the patent is intended to serve the Defendant's V has a short arm which extends from the apex of the V to the clip and since this arm is rigidly coupled to the body portion at the body clip it may fairly be regarded to end at this point so that the defendant's V is actually independent of the body portion in the same way as the V of the patented device. We think also that defendant's structure has the equivalent of the angular offset of the Neely spring. The extension of defendant's wire through the clip to the end of the spring and the doubling of it back above instead of below the body portion serves the same purpose as the offset of the short arm of the V in the patent.

Defendant's main reliance in its argument of non-infringement does not rest, however, on these structural differences

but upon the contention that the accused structure does not accomplish the basic purpose of the patent to furnish a spring free of stiffness in localized areas. In-deed, the defendant goes further and says that the plaintiff has abandoned this purpose in the commercial spring which it makes and sells to the trade.[1] This phase

1. The perspective view on Page 144 of a representative type of the three springs in issue may be helpful in demonstrating their distinguishing characteristics. In

of the controversy is best understood by reference to Plaintiff's Exhibit 11 which consists of three identical springs of the plaintiff, Plaintiff's Exhibit 11A, and one spring of the defendant, Plaintiff's Exhibit 11B, which are mounted in parallel lines in a model of the frame of the back of a seat structure. The springs of the plaintiff, 11A, vary from the spring depicted in Figure 7 of the patent in that there are four loops of the offset portion of the supporting spring above the V which are double with the body portion and are coupled by two clips, one at either end of the double area, to the body portion. In Figure 7 of the patent only two adjacent loops are coupled with one clip. Claim 2 of the patent, however states that at least two straight portions of the short arm of the V are rigidly coupled to the body portion.

█ Defendant's accused spring, 11B, differs somewhat in construction but serves the same purpose. Above the coupling of the arm of the V to the top of the springs there are six double loops. In other words, the area above the V in both springs is reinforced, in plaintiff's 11A by the doubling of four loops, and in defendant's 11B by the doubling of six loops. So similar are the two commercial structures in purpose and in function that the defendant admits that its structure is equivalent to the plaintiff's and that infringement is made out if the plaintiff's spring embodies the invention. Defendant, however, vigorously contends that the spring, 11A, departs from the concept of the patent in that reinforcement of the upper part of the spring by doubling the loops creates an area that is stiffer than other parts of the spring. The evidence clearly demonstrates this fact. Not only is it obvious that doubling the loops increases the resistance but the experts on the opposing sides at the trial below agreed that the reinforced area has at least double the stiffness of the same area in the spring depicted in the patent. The District Judge nevertheless held that the purpose of the patent was served by the commercial structure and after careful examination of the evidence we find ourselves in agreement with the conclusion. The patent speaks, it is true, of freedom of the springs from stiffness in localized areas but it adds that the spring should readily yield to the load. It is common knowledge, as the evidence shows, that the pressure of the sitter upon the back of the seat varies at different points of the body. The springs support a heavier load at the shoulder blades than at the lower part of the body and consequently the sitter experiences no stiffness simply because the spring is stronger at the top than at the bottom. There is no objectionable hard spot at the point of coupling which, according to the evidence, the invention was designed to avoid. We think with the District Judge that it is reasonable to interpret the language of the patent in relation to its purpose to make a seat which would seem flexible rather than stiff to the user. The evidence shows that the purpose was accomplished by the commercial success in the trade of

each instance: a. is the load bearing member and b. is the V-shaped supporting member; in application points 1 and 2 are fastened to the frame of the seat back, and the arm ending at 3 remains free save for the restraint of the covering upholstery.

A. represents the spring as illustrated in the patent, with the V-shaped supporting member coupled rigidly to the load bearer at two adjacent straight portions of the corrugations by an angular offset of the short arm of the V one loop in length.

B. represents the more commercially successful spring of the patentee, with the angular offset of the short arm of the V extended along the rear face of the free end of the load bearer by two additional loops (in this instance) and coupled with the load bearer at each end of the offset, thus stiffening the resistance to pressure of the free end.

C. represents the defendant's claimed infringing spring, wherein the supporting V-shaped member is formed by bending the load bearer back over its own surface to form a doubling of the loops, by clipping the bent-back portion to the load bearer, and from that point by shaping it into a supporting V.

both of the competing springs. The upper part was made stronger to meet the heavy load at this point and also to make the trim of the upholstery more compact and firm to conform to stylistic changes but still sufficiently flexible to yield to the load.

The meaning of hard spots and the desirability of avoiding them in a seat were shown in the patent office proceedings when the inventor was called upon to distinguish his invention from prior patents, notably the French patent to Ortet, No. 621,947 of 1927, and his own prior patent No. 2,308,772 of 1943. These earlier patents showed that the use of a V-shaped spring was old in the manufacture of furniture and Neely's application for the patent in suit, No. 2,480,667, was accordingly rejected by the Examiner. His decision, however, was reversed upon appeal to the Board of Appeals in the patent office which accepted the distinction Neely had presented to the Examiner. In his correspondence with the Examiner Neely again and again stressed the presence of stiffness in the springs of Ortet and of his prior patent 772 and the absence of this stiffness in the spring described in his pending application. He showed that in the Ortet spring the V was pivotally and not rigidly connected with the body portion and that this arrangement would produce a local hard spot in the spring; and he also showed that in his prior patent 772 a V was connected with the load bearing member at its lower end and that the supporting spring in the upper end ran straight from the load bearing member to the frame of the seat creating a hard spot at the point of connection. In contrast with this structure the inventor pointed out that the hard spot was avoided in his new invention by the rigid coupling of the short arm of the V to the body portion between its ends and by the acute angle of the V so as to give flexibility to the supporting member and thus enable the spring to yield to the load while conforming to it through a mutual exchange of the bending stresses between its members.

The Board of Appeals upheld this argument. It accepted his statement that the straight supporting member in his patent 772 would produce a localized stiffened area resulting in a hard spot to correct which excessive amounts of padding were needed and that this defect had been overcome in the patent in suit. The patent office did not have before it the plaintiff's commercial structure depicted in PX 11A and hence it did not have an opportunity to pass on the question whether the plaintiff's commercial structure is in accord with the teaching of the patent; but its decision supports our conclusion that when the patent speaks of localized stiff areas it means hard spots objectionable to the user and does not indicate that all parts of the spring shall have the same flexibility. The defendant had the plaintiff's springs, 11A, before it when it put its spring, 11B, upon the market, copying the plaintiff's structure with immaterial variations. Infringement of the patent is made out.

We come then to the defense that the patent in suit did not involve invention in view of the disclosures of the prior art. We confine our discussion to three patents which form the basis of defendant's argument, i. e. Neely's patent 772 of 1943, the French patent to Compin, No. 387,701, of 1908, and the U. S. Patent to Fryer, No. 2,034,092 of 1936. These patents clearly show that both flat and corrugated wire springs in seat structures were well known to the prior art and also that V or U-shaped supporting springs had been used to produce a cantilever effect. The Neely patent 772, as we have seen, was before the patent office and was specifically mentioned by the Board of Appeals in its opinion as a device with undesirable hard spots produced by a supporting spring at the top of the seat which ran without an intervening V directly from a point in the body portion to the top of the frame. At the bottom of the spring there was a V-shape member coupled to the end of the body portion and to the frame at the bottom. In the patent in suit, how-

ever, Neely moved the V from the bottom to a point between the ends of the body portion and cured the defect in his 772 invention and the Board of Appeals held that this change involved patentability.

The defendant relies, however, in its argument of invalidity more particularly on the Compin and Fryer patents which were not before the patent office, rating Compin first and Fryer second in importance. Compin shows the use of two U-shaped supporting wire band springs in the seat rather than in the back portion of the structure. Turned sidewise so as to resemble the back rather than the seat of a chair, the figures in the patent show two U's—one attached to each end of the body portion.[2] In this area the wire is doubled somewhat like the doubling of the loops in the commercial spring of the parties to this suit. One arm of the U is coupled to the rear of the body portion at a point about one-fourth of the distance from its ends and runs with additional coupling thence to the end thereof. The other arm of the U is attached to the frame. The general similarity between this structure and those as shown in the commercial springs, PX 11A and 11B, is obvious; but the differences become significant when it is realized that seemingly slight changes in structure have important bearing upon the comfort of the user of the seat as in Neely's elimination of the hard spots in his earlier structure. We notice in Compin that straight wire bands are used where Neely employs corrugated wire. In Compin the supporting springs are placed in the seat at the sides and not in the center where the greater weight is located. In Neely's the spring is stronger in the shoulder blade area of greater resistance. In Compin the arm of the U comes in contact and is coupled with the body portion in as nearly parallel a position as possible with the body portion. There is no mention as in Neely's that this arm of the V (or U) should have an angular offset portion

or that the coupling of the arm to the body portion should be placed between opposite ends thereof. There is also the important difference between the structures that in Compin the end of the load bearing member is rigidly attached to the frame of the seat A–502, whereas in Neely the end of the load bearer is free and only the long arm of the V-shaped supporting spring is attached to the frame.

In the Fryer patent we find a load bearing spring of straight and not corrugated wire joined to the frame at each end only by fabric. It is supported by two V-shaped springs of which one arm is a continuation of the end of the load bearer bent under and clipped to the load bearer, while the other arm is attached to the end of the frame. The two V's overlap and together underlie the entire seat and their apices are coupled together in the center by a coiled spring. The differences in detail between this structure and that in the patent in suit are apparent.

■ It is obvious even to the casual observer that the relation between the load bearer spring and the supporting spring, and the relation between these two springs and the frame of the seat structure are not the same in the cited patents of the prior art as they are in the patent in suit and that the results produced will, therefore, not be the same. This conclusion indeed is supported by the testimony of the defendant's principal witness, an expert with long practical experience in the business, who agreed that structural changes of this kind produce different reactions at least in degree. One who achieves significant functional improvements in mechanisms already in use need not be barred from patent protection merely because the result was attained by a seemingly slight or simple innovation. Eibel Process Co. v. Minnesota and Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

2. The patent in suit speaks of V-shaped or U-shaped springs as interchangeable.

■ The practical experience of both parties to the suit who are active competitors of the trade attests the value of the Neely structure in the business world. So far as we know the structures depicted in the Compin and Fryer patents were not manufactured while the Neely idea has been exploited with great success. The defendant urges that this success was due to the business acumen and sagacity of the plaintiff's executive officials rather than the merits of its product and this may be true in a measure. Nevertheless, business commercial success may properly be weighed as one factor in considering the question of invention. Hutzler Bros. Co. v. Sales Affiliates, 4 Cir., 164 F.2d 260, 267; Florence-Mayo Nuway Co. v. Hardy, 4 Cir., 168 F.2d 778, 781; cf. B. F. Goodrich Company v. United States Rubber Company, 4 Cir., 244 F.2d 468.

In the present instance particularly the value of the invention is shown by the action of the defendant itself who, guided by long and successful experience in the manufacture of furniture springs, incorporated the idea of the patent in suit in its own line of goods after the plaintiff had demonstrated its advantages to the purchasing public.

■ The plaintiff is also entitled to the benefits of the statute, 35 U.S.C. § 282, which declares that a patent issued by the Patent Office shall be presumed valid and places the burden of establishing invalidity on the party asserting it. We do not think as the plaintiff contends that an infringer must prove invalidity beyond a reasonable doubt. The cases on which the plaintiff relies for this rule, to wit: Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983, and Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453, were cases in which priority of discovery of the same invention was the issue rather than invalidity by reason of relevant disclosures of the prior art. Nevertheless, the presumption accorded by the statute is entitled to weight in this case strengthened to some extent by the more than usual consideration given to the problem of patentability in the Patent Office, Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 181 F.2d 550, and weakened to some extent by the fact that the Patent Office did not have before it such prior art references as the Compin and Fryer patents. cf. Artmoore Co. v. Dayless Mfg. Co., 7 Cir., 208 F.2d 1, 4. However, the Patent Office did have before it the Neely patent 772, above described, and also the Nelems patent No. 2,203,598 of 1940. The latter was unlike Compin in that the load bearer followed a curve instead of a straight line but it did disclose the important cantilever effect of two U-shaped supporting springs of which one arm was attached to the end of the load bearer and the other was attached to the frame. Notwithstanding these conclusions the patent in suit was granted obviously because of the differences in its structure which contributed to its practical success.

■ Taking into consideration the presumption of validity arising from the issuance of the patent, the differences between the structure it disclosed and those shown in prior patents, and the demonstrated success of the competing products manufactured by the parties to this suit, we conclude that the District Judge was justified in upholding the validity of the patent.

Affirmed.