Charles J. ALLEN, Jr., and American Crankshaft Company, Plaintiffs,

v.

STANDARD CRANKSHAFT & HYDRAULIC COMPANY, Inc., Parts Warehouse, Inc., and Homer H. Brackett, Defendants.

Civ. No. 1607.

United States District Court
W. D. North Carolina,
Charlotte Division.

Argued May 18, 1962.

Decided Nov. 7, 1962.

Channing L. Richards, Frank H. Kennedy, Clarence W. Walker, Charlotte, N. C., for plaintiffs.

William J. Waggoner, Paul L. Muilenburg, Charlotte, N. C., Joseph Y. Houghton, Washington, D. C., for defendants.

CRAVEN, Chief Judge.

This case presents a cause of action for patent infringement with which there have been joined a second cause of action for trademark infringement and a third for unfair competition. The court has jurisdiction of the parties as to all three causes of action. Jurisdiction as to the causes of action is accorded by statute— the cause for unfair competition being related to the claims asserted under the patent and trademark laws. 28 U.S.C. § 1338(b).

Co-temporaneously with the filing of this opinion, the court has filed detailed findings of fact and conclusions of law.

The patent in suit, about which the controversy principally involves, is United States Patent No. 2,567,685 issued on September 11, 1951 to the plaintiff Charles J. Allen, Jr., who presently owns the patent and who was the inventor. Plaintiff American Crankshaft Company operates as a licensee under the patent.

The invention covered by the patent in suit is a process for rebuilding worn automotive crankshafts and the like by welding and regrinding. The inventor, Mr. Allen, had previously been engaged in the "undersized" grinding business which consisted of grinding the bearing surfaces of a worn crankshaft to a smaller diameter. Undersize grinding has at least two disadvantages: the process cannot be repeated many times, and the thrust bearing surface cannot be reworked so that any lateral play due to wear is left uncorrected causing mechanical difficulty when the reconditioned shaft is installed in an engine block.[1] Mr. Allen considered alternative methods of reconditioning crankshafts, including chrome plating and metalizing, eventually abandoning them in favor of the patented method.

The main impetus for beginning this business was the shortage of new crankshafts occasioned by World War II.

All four of the Allen patent claims are comparable statements or definitions of the patent concept. Basically, all four claims may be separated into two parts: namely, (1) rebuilding and stabilization of the crankshafts for finishing and (2) finishing the stabilized crankshafts while establishing lineal relations that must be observed. The basic steps involved are:

(1) The fusing or welding of metal surface coatings at the crankshaft bearing areas; and

The rough grinding of the rod throws for relieving to a substantial extent the internal distortion stresses that result from the application of the surface coatings.

(2) Finish grinding the rod throws first so as to relieve fully any residual or remaining internal stress before the mains are finish ground; and

Carrying out the finish grinding as a whole to provide an ultimate compensation for any residual welding distortion so that the rebuilt bearing areas are all lo-

1. Allen Patent, column I, line 45.

cated in proper lineal relation with respect to the crankshaft thrust surface by which the operating position of the crankshaft will be fixed.

Location of the thrust bearing surface is perhaps the most important phase of the process of the present invention.[2] This is true because the thrust bearing surface controls the location of the shaft in the engine block. The form and arrangement of a crankshaft present unusual difficulties in machine work. The shaft has a tendency to spring and run out of true while it is being machined. These problems are magnified in the rebuilding of a worn crankshaft because the heat of the welding operation causes warpage and distortion. According to the Allen patent, the welding operation also destroys the identity of the original bearing surfaces so that they must be relocated.[3]

### VALIDITY OF THE PATENT

It is conceded by the plaintiffs that the patent is no more than a new combination of old elements. The application for the patent contained the premise that no practical method had been previously developed for applying welding and grinding techniques to the rebuilding or reconditioning of crankshafts.[4] This premise was erroneous. Volume 88, no. 9, September 1930 issue of the magazine Industrial Engineering contained an article entitled "Arc Welding Adds Life To Large Crankshafts". The article contained the following: "By means of the arc welding process it is possible to build up large shafts that are worn and thereby save money for a company whose equipment includes these large engines. After welding they can then be turned down again to the proper diameter."

The publication "Mechanical Handling" of July 1945 contains an article about building up worn machine parts by welding, metalizing, or electrical plating, with the warning that a crankshaft should not be built up by electrical welding unless subsequent heat treatment is possible.

The Welding Encyclopedia published in 1943 disclosed the use of automatic welding machines to repair crankshaft journals.

The August 1926 issue of the magazine Abrasive Industry contains information about the proper sequence in the grinding of crankshafts, listing seven steps and showing the proper sequence to be the grinding of rod throws and finish grind the bearings. Patent No. 2,182,228 for a method of machining crankshafts, issued to W. F. Groene in 1939, also indicates a grinding sequence similar to that taught in the Allen patent, i. e., to finish grind the rod throws (crankpins) before finishing the main bearings. The above-referenced article in Abrasive Industry also indicated the previous use of a spacing bar to correctly locate the grinding of bearings in a lineal relationship.

It is apparent all the elements were either "patented or described in a printed publication in this * * * country, before the invention thereof by the applicant for patent". See 35 U.S.C. § 102 (a).

The real problem with which the inventor wrestled was the distortion of the crankshaft caused by the heat of the welding operation and inherent in the peculiar shape of the shaft itself. Metal expands when heated but contracts in almost like degree so that "shrinkage" is not appreciable. It is warpage or distortion that causes the trouble, and in the case of automobile crankshafts the trouble consists almost entirely of getting the reconditioned shaft to fit back in the engine block.

All of the evidence tends to show that very little compensation needs to be made at the thrust bearing surface to compensate for distortion so that the shaft will fit into the block. Usually it is less than 20/1000 of an inch. The Allen pat-

---

2. Allen Patent, column VII, line 39.

3. Allen Patent, column III, line 1.

4. Allen Patent, column II, lines 30–38.

ent itself says that the dimensional change will amount to only a slight shortening or lengthening of the shaft for which compensation may be made readily in grinding the thrust bearing surface.

It is difficult to accept plaintiffs' contention that a measuring gauge made of connecting rod steel is sufficiently fine and accurate to permit measurements accurate to 20/1000 of an inch and even less. It is more likely that such a gauge would indicate merely whether the shaft has lengthened or shortened during the conditioning process.

In any event, it does not seem to the court that the measuring of the lineal relationship of component parts of a crankshaft is patentable—by whatever method. It would seem obvious to one skilled in the art that if a shaft won't fit in an engine block that a minute lineal change in the location of the thrust bearing would likely solve the problem. This is so because an engine block has relatively wide tolerance for the component parts of a shaft. The rod throws can appreciably vary from their original position and still work well in an automotive engine.

Since 1948 the gross sales of American Crankshaft Company have amounted to more than $2,750,000.00 by the date this suit was filed. If this be deemed remarkable commercial success, it is due not to the teaching of the patent so much as to hard work and mechanical expertness and know-how. Commercial success alone, although entitled to consideration, does not make valid a patent. Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. And see: Universal, Inc. v. Kay Manufacturing Co., 301 F.2d 140 (4 Cir., 1962).

By way of summary, it is not invention in the light of the prior art to fuse a surface coating of metal on the main journals and rod throws and thrust bearing surfaces of a crankshaft; nor is it invention to rough and finish grind said rod throws and journals in any particular sequence in view of the prior art; nor is it invention to measure one's work in any manner to be sure that the shaft will fit in the engine block; nor is it invention to change the location of the thrust bearing surface so as to, in effect, "lengthen" or "shorten" the shaft so that it will fit into an engine block for the reason that this is an obvious expedient to a mechanic skilled in automotive work.

Are these old skills combined in a new method to achieve a new and useful result? No. Whether a combination of old skills has that impalpable something which distinguishes invention from simple mechanical skill cannot be answered by applying the test of any general definition of invention. 40 Am.Jur. Patents sec. 41. Patentability does not exist in the application of an old process to a new subject. The grinding of old crankshafts is closely analogous to the grinding of new ones; even the basic problem of distortion is the same. If the Allen patent advances the art, it is an advance plainly indicated by the prior art. See: Triumph Hosiery Mills v. Alamance Industries, Inc., 4 Cir., 299 F.2d 793. The question of validity of a patent may be a question of law. Douglas, J., concurring in Great A & P Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154, 156, 71 S.Ct. 127, 132, 95 L.Ed. 162, 168. But whether an improvement requires mere mechanical skill or the exercise of the faculty of invention is a question of fact. Although the Allen patent is not identically disclosed or described as set forth in sec. 102 of Title 35, the court finds that the differences between the method sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having an ordinary skill in the art to which said subject matter pertained. See: 40 Am.Jur. Patents secs. 45, 46, 54, 194 and 35 U.S.C. § 103.

The court has not overlooked 35 U.S.C. § 282 which declares that a patent issued by the Patent Office shall be presumed valid and places the burden of establishing invalidity on the party asserting it. This presumption is weakened by the fact that prior art references referred to in this opinion were not cited.

See: Royal Patent Corp. v. Monarch Tool & Manufacturing Co., 6 Cir., 203 F.2d 299 and cases cited therein. Defendants have proved invalidity by clear and convincing evidence. They are not required to do so beyond a reasonable doubt. Universal, Inc. v. Kay Manufacturing Co., 301 F.2d 140 (4 Cir., 1962).

### INFRINGEMENT

Assuming that the Allen patent has validity, the court is of the opinion that defendants have not infringed the patent.

Defendants do not use any gauge or any measuring device whatsoever for the purpose of relocating the thrust bearing surface. Instead, defendants rely heavily upon controlled heat treatment to diminish distortion and put great emphasis in carefully straightening the shafts in a hydraulic press for the same purpose. Plaintiffs do the same, as a matter of fact, but appear to consider these procedures of less controlling importance. Defendants do not fuse metal on both thrust bearing surfaces, and as a rule build up the unworn side of the thrust bearing surface. Inevitably, as plaintiffs contend, the obvious effect is to relocate the main bearing thrust by the amount of the wear, and the obvious result of this relocation is to shift the shaft forward in compensation for the residual welding distortion or "shortening". The court agrees with plaintiffs that the defendant is "content with a rough compensation", through ungauged thrust relocation, but it does not follow, as plaintiffs insist, that defendant is infringing the Allen patent. Defendant is also content with a rough equalization of connecting rod alignment. The court is of the opinion that an automotive crankshaft is serviceable even though the connecting rod is not perfectly centered. This is perhaps not true in industrial engines. The court agrees with plaintiffs' contention that to leave the rod widths wide affords additional assurance that the rough compensation for residual distortion, that defendants make

through ungauged thrust relocation, will be passable.

One of the premises of the Allen patent is that the welding operation destroys the identity of the original bearing surfaces so that they *must* be relocated.[5] This is not true of the defendants' process. Defendants grind bearing surfaces "where they lie" without any attempt to relocate any point other than the thrust bearing surface. Defendants relocate the thrust bearing surface only in the sense that they build up the unworn side. It would be equally accurate to say that defendants grind the thrust bearing surface "where it lies" on a worn shaft, which is different from the location of the thrust bearing surface on a new shaft only to the extent of the wear. It is true that scarring (by the grinding wheel) of the counter weights of the shafts is an indication of distortion. But it is not clear whether such scarring would indicate a "shortened" or "lengthened" shaft. It is possible that an experienced operator may be guided in his location of the thrust bearing surface by the extent and kind of scarring of the counter weights in the grinding process. Certainly such scarring calls for either more hydraulic press straightening or a minute relocation of the thrust bearing surface.

Plaintiffs earnestly contend for a substitution of equivalents. Although the claims of the Allen patent do not mention gauging as such, it is beyond question that both the claims and the application give great emphasis to careful lineal measurements.[6] The issue to be determined is whether the defendant has used the same or equivalent means of producing the result which is achieved by the patented invention. 40 Am.Jur. Patents sec. 158. Even if the defendants' process produces the same result, that alone does not indicate infringement. In order to infringe, defendants' process must operate in the same mode or manner. Id. sec. 160. If it appears that the

---

5. Allen Patent, column III, lines 1–3.

6. Half of column VI and half of column VII relate entirely to lineal measurements and related location of rod throws with respect to each other as well as to the thrust bearing surface.

defendants' process operates in a different manner, the charge of infringement is not established. Ibid.

■■ In a combination patent, all of the elements are material. For there to be infringement, the elements combined must be the same, and combined in the same way, so that each element performs the same function. Id. sec. 163. The patentee of an invention consisting of a combination of old ingredients is entitled to the benefit of the doctrine of equivalents, and if some of the elements are used by the defendant and for the others mechanical equivalents are used, which were known to be such at the time when the patent was granted, infringement results. Id. sec. 164.

■ There is no evidence whatsoever tending to show that defendants make any effort to measure the lineal relationship of rod throws as to each other or as to the location of the thrust bearing surface. Defendants' position is that no measurement of any sort is necessary and that regrinding the surface "as it lies", including the thrust bearing surface at the point where it is worn, will usually result in a crankshaft that is serviceable and will fit the engine block. Defendants' process, therefore, omits entirely one of the essential elements of plaintiff's patent and does not supply the omission by an equivalent device known to be such at the time. Such an omission avoids infringement. Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059; Band-It Co. v. McAneny, 10 Cir., 131 F.2d 766, cert. denied 318 U.S. 773, 63 S.Ct. 770, 87 L.Ed. 1143, pet. for rehearing denied 316 U.S. 803, 63 S.Ct. 980, 87 L.Ed. 1166.

It is true that plaintiffs and defendants achieve substantially the same result. But, as Judge Coleman said in Specialty Equipment Co. v. Zell Motor Car Co., D.C., 96 F.Supp. 904, 907, reversed on other grounds, 4 Cir., 193 F.2d 515:

"It is not true that every combination which produces the same effect is necessarily an equivalent of any other combination used for the same purpose. If the alleged infringing device differs from that of the patent only in form, or in the rearrangement of the same elements of the combination, there is infringement even if in certain particulars the second device be an improvement upon that of the patent. But even if the patent be a pioneer one, the alleged infringer must have done something more than reach the same result. He must have reached it by substantially the same or similar means. The function itself is not patentable, so if we say that a patentee of a new mechanism is entitled to every mechanical device which produces the same result, this would be to hold, in effect, that the patentee is entitled to patent his function."

By way of summary, defendants recondition a serviceable crankshaft for an automotive engine that is substantially the same as plaintiffs'. Defendants accomplish this result by (1) controlled heat treatment, (2) careful and expert sequence grinding, (3) hydraulic press straightening, and (4) rough partial and unmeasured thrust "relocation" to the extent of wear and as may be indicated by grinding scars on the counter weights of the shafts. Original bearing surfaces are not destroyed by defendants' process and are, therefore, not relocated by measuring or in any equivalent manner—an essential element of the Allen patent.

Infringement has not been established.

## ABANDONMENT

■ Under the provisions of the statute, 35 U.S.C.A. § 102, an inventor's creation must not have been in public use or on sale in this country for more than one year. Otherwise it will be deemed to have been abandoned. 40 Am.Jur. Patents sec. 64.

For the purpose of applying the provisions of the statute, the date of the letters patent is taken as the date of the application therefor in the absence of any showing to the contrary. The filing of the original Allen patent application was on May 7, 1949, so that the question for the court is whether or not there was a

public use of plaintiff's process prior to May 7, 1948.

■ A defendant who relies on prior use to defeat a patent must establish the prior use by evidence that is "sufficiently clear, cogent, and satisfactory as to remove all reasonable doubt." Merrill v. Builders Ornamented Iron Co., 197 F.2d 16, 19 (10th Cir., 1952); the Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154 (1892) and see Hoeltke v. Kemp Manufacturing Co., 80 F.2d 912 at 923 (4th Cir., 1936).

■ But, where the defense to an action for infringement is alleged prior public use of an invention and where such defense is not only by the allegation that the use was not a public use because it was for the purpose of perfecting an invention and tests and experiments, the proof on the part of the patentee should be full, unequivocal and convincing. 40 Am.Jur. Patents sec. 193 (p. 677).

The evidence shows conclusively the following facts:

That during 1945 plaintiff was building up both rod throws and main journals by electric welding and was out of the metalizing business entirely; that during 1945 and 1946 plaintiff bought seven Union Melt welding machines, installed two heat treating furnaces, each of which had a capacity of about thirty crankshafts. In 1947 a wheelabrator was acquired at a cost of $6,000.00 for removing furnace scale from crankshafts heat treated in the furnaces.

On May 15, 1946, plaintiff distributed its dealer's price sheet to some 2,000 persons quoting prices for standard crankshafts which "are not metalized but restored to standard size by our own method". In July 1946, plaintiff adopted the service mark "ARCPLATED" for reconditioning automotive crankshafts by rebuilding the worn surfaces thereof by arc welding and grinding the rebuilt surfaces. By 1947 the average daily production of these shafts was 20 to 30 a day, which would amount to about 5,000 or 6,000 shafts for the year. Sales of "ARCPLATED" shafts for the fiscal year ending March 31, 1948 amounted to over

$120,000.00. During the period from 1945 until May 7, 1948, none of plaintiff's employees were adjured to secrecy, nor were visitors excluded from the plant. The first gauge used by plaintiff comprised feeler arms for measuring the distance between the rear thrust bearing surface and the neck of the shaft, and such a gauge was used before the critical date, May 7, 1948.

Plaintiff Charles J. Allen, Jr. signed a complaint in the trade secret case instituted in 1949 giving the date of the trade secret as April 1948.

The foregoing facts are established not only by clear and satisfactory evidence but are, in fact, established beyond all question.

Some of the testimony tends to show that the gauge used prior to May 7, 1948 comprised intermediate feeler arms for contacting the rod throws.

Gauging as such is not an essential element of the patent. Whether or not feeler arms contacted the rod throw cheeks does not determine prior use.

■ Unquestionably all of the evidence tends to show that the elements of the patent were in non-secret commercial use prior to May 7, 1948. The delay in filing application for letters patent for over a year thereafter effected, as a matter of law, an abandonment thereof to the public.

But plaintiffs stressfully contend that there can not have been public use because the invention was not completed until its conception had been reduced to practice. Plaintiffs contend that this reduction to practice occurred when Mr. Allen embodied a tangible indication of his conception in the "gauge". Mr. Allen described his conception of the patented process as follows:

"* * * So to help relieve a lot of the shrinkage I figured we could mark the positions in the grinding operation and we could grind the shaft back in the right position that would fit. So the thought came to me at home in bed to shift the welding of the thrust from the worn part to the front end of the crankshaft,

to shove the shaft forward a little bit and make a pointer to all the rod throws on the crankshaft in relation to the thrust and overall length."

Plaintiffs say in their brief furnished the court: "But the point of departure that completed the patented process was the change from the natural impulse to weld the worn rear thrust surface to the welding of the unworn front thrust instead, so that welding distortion could be compensated for effectively throughout the entire crankshaft."

Unfortunately for this contention, there is nothing whatsover contained in the teachings of the patent that shows the key to success to consist of welding the unworn front thrust instead of the worn rear thrust. The court is convinced that both plaintiffs and defendants do this, but they would not learn to do it from the Allen patent. The patented process does not disclose the welding of a *single* thrust surface but instead teaches fusing a surface coating of metal on the "thrust bearing surfaces" (pl.). If the secret of invention is the welding of only *one* thrust bearing surface, then the patent may well be void for the reason that no one can tell, except by independent experiments, how to effectively use the patented process. 40 Am.Jur. Patents sec. 87. If fusing the unworn thrust surface (and not the worn one) is an element of the Allen invention, it is vaguely and indefinitely hinted at.

The court is of the opinion that selection of the unworn front thrust for welding is not embraced within the invention, and, therefore, Mr. Allen's appreciation of the importance of so doing cannot be said to be a reduction to practice of the Allen patent.

██ A single use for profit, not purposely hidden, is a public use within the meaning of the statute. 40 Am.Jur. Patents sec. 65. The result of plaintiff's commercial use is to constitute abandonment.

### TRADEMARK AND UNFAIR COMPETITION

██ Plaintiff used its mark "ARCPLATED" to identify its goods in commerce prior to the time of defendant's adoption of its mark "Arcwell". Both parties filed application with the Patent Office in 1951 at approximately the same time. Plaintiff's mark was issued one week prior to the issuance of defendant's mark. Both parties have filed the required five year affidavits to acquire incontestability. Neither mark was ever registered with the Secretary of the State of North Carolina under Chapter 80 of the General Statutes of North Carolina. 15 U.S.C. § 1065 provides that after a registered mark has been in continuous use for five consecutive years * * * it shall be incontestible unless it infringes a valid right acquired under the law of any state by use of a mark * * * prior to the date of publication. Unquestionably, by substantial use in commerce to identify its reconditioned crankshafts, the plaintiff acquired a valid right under the common law of North Carolina some time prior to 1951. This is true unless, as defendant contends, the statutory trademark law of North Carolina supplants the common law. Undoubtedly where the North Carolina General Assembly has legislated with respect to the subject matter of a common law rule, the statute supplants the common law with respect to the particular rule, but so much of the common law as has not been abrogated or repealed by statute is in full force and effect within this state. N.C.G.S. § 4–1; McMichael v. Proctor, 243 N.C. 479, 91 S.E.2d 231; Elliott v. Elliott, 235 N.C. 153, 69 S.E.2d 224. Nothing contained in Chapter 80 of the General Statutes of North Carolina indicates an intention of the General Assembly to abrogate the common law. The general rule adopted by the courts is that state statutes providing for registration of trademarks are in affirmance of the common law; that the remedies given by such statutes are either declaratory or are cumulative and additional to those recognized and applied by the common law. Nims, Unfair Competition and Trade-Marks, sec. 223(b). Defendant's mark "Arcwell" is, therefore, not incontestable for the reason that plaintiff had a pre-existing valid right acquired under

the law of North Carolina by use of its mark previous to the date of publication of defendant's "Arcwell" mark.

It, therefore, becomes necessary to consider whether or not "Arcwell" infringes plaintiff's mark "ARCPLATED". Both are registered in Class 103, "Repair and Construction". Both are used on substantially the same article. It was made clear at the trial that no one can look at a reconditioned shaft and tell whether plaintiff or defendant did the job. The shafts of both parties are identical in appearance.

Defendant knew of plaintiff's mark when it selected its own. Both parties use arc welding in their process. Defendant expressed intention to select a mark that would be descriptive.

There has been no appreciable confusion of goods. Customers for reconditioned crankshafts have been mostly automotive jobbers or maintenance departments of large automotive fleets. Such customers know with whom they deal and rely upon the company rather than upon the mark. Until now almost no one has asked for a crankshaft by the name "Arcwell" or "ARCPLATED". But this is of greater importance in connection with unfair competition than it is with regard to trademark infringement. To establish infringement, plaintiff need only show that the mark adopted by defendant is so similar to its mark as to be *likely* to cause confusion among reasonably careful purchasers. The applicable statute, 15 U.S.C.A. § 1114(1), requires only that in an action for trademark infringement the colorable limitation be * * * likely to cause confusion or mistake. It is not necessary to show actual instances of deception or confusion, nor is there any necessity to prove actual damage. Abramson v. Coro, Inc., 6 Cir., 240 F.2d 854. It is obvious that, if the parties succeed as they have in the past and continue to expand their market, eventually those members of the consuming public interested in the repair of automotive engines may come to know and rely upon the respective marks. The court cannot assume that the present jobber methods of marketing will prevent this.

"What degree of resemblance is necessary to constitute an infringement is incapable of exact definition, as applicable to all cases." McLean v. Fleming, 96 U.S. 245, 251, 24 L.Ed. 828, 832 (1877). There may be infringement though only a part of the trademark has been appropriated. "(T)he imitation need only be slight if it attaches to what is most salient." Nims, Unfair Competition and Trade-Marks sec. 221(F). It is, of course, a question of fact as to whether the part of a trademark which has been copied is the salient, dominant part. Partly because of the difficulty of remembering which is which, the court is of the opinion that the salient part consists of "Arc". The two marks in this case have sufficient similarity in appearance, sound, and especially significance, so as to be likely to cause confusion among reasonably careful purchasers. For a listing of trademarks held infringed because of colorable similarity in appearance, sound, and significance, see Nims, supra, sec. 221i (A) 1, 2, 3, 4, & 5. Even though plaintiff may not have been damaged, the likelihood of future confusion supports its right to have the defendant's mark cancelled.

The action for unfair competition, which developed out of the trademark infringement action, usually, but not always, involves confusion of origin and passing off. The Court of Appeals for this circuit has held that unfair competition is not confined to palming off. Lone Ranger v. Cox, 124 F.2d 650, 653 (4 Cir., 1942). The Supreme Court of North Carolina has held likewise. Carolina Aniline & Extract Co. v. Ray, 221 N.C. 269, 20 S.E.2d 59 (1942).

No inflexible rule can be laid down as to what conduct will constitute unfair competition. Each case is, in a measure, a law unto itself. Unfair competition is a question of fact. The universal test question is whether the public is likely to be deceived. Ibid.

Each of the parties to this action produces substantially the same

result, i. e., a serviceable reconditioned crankshaft. Defendant, when it began its business, represented to customers of plaintiff that certain key personnel of plaintiff were establishing a new company. This was true. There is no substantial evidence that the defendants ever palmed off their goods as goods of the plaintiff. They have never represented that their shafts were those of plaintiff, but simply that they were as good or better.

Plaintiff contends that defendant by its very name represents that it turns out "standard" crankshafts. Plaintiffs are concerned because defendant's customers will buy its crankshafts although rod widths are too wide, resulting in alleged "sloppy" connecting rod alignment which may cause no more than symptomatic "engine knocking" in an automotive engine, but is likely to cause mechanical failure in an industrial engine.

The trouble with this contention is that plaintiff gives too narrow a meaning to the word "standard". In the automotive trade it doesn't mean what plaintiff would like for it to mean, but simply describes a restored crankshaft that has been built up to original diameters rather than ground down to "undersize". Even assuming that defendant's method results in imprecisely engineered shafts, they are still "standard" in the accepted meaning of the word in the trade. That being so, there is nothing "unfair" in defendant's use of the word "standard" in its corporate name.

The court is of the opinion that there is no merit in plaintiff's cause of action for unfair competition, and that it ought to be dismissed.

### LACHES

Plaintiff notified the defendant of the issuance of the Allen patent in October 1951. During 1953 and 1954 plaintiff and defendants exchanged correspondence having to do with whether or not defendants were infringing the Allen patent. The last communication between the parties (before this lawsuit) was in 1954. Defendants at all times maintained that they were not infringing and continually expanded their business—book value increasing from approximately $66,000.00 in 1951 to $250,000.00 at the time of institution of suit. Virtually all of the expansion is attributable to retention of earnings. The court has found as a fact (separately filed) that the defendants have been advantaged rather than disadvantaged by the delay in bringing this lawsuit. The delay has enhanced defendants' competitive position and enabled expansion from profits. The net value of defendants' assets far exceed any indebtedness.

The defendants have never been lulled into a false sense of security but rather have been continuously apprehensive of this lawsuit. Only in theory could defendants have gone into a different type business or method of operation. As a practical matter, the experience and "know-how" of defendants' management is largely in the business of reconditioning crankshafts.

Laches is not determined solely by the mere passage of time. There must be other considerations that make it inequitable for the suit to be prosecuted, among the most essential of which is a showing that the defendant has been damaged or prejudiced by the delay. The expansion of a business from the profits reaped by (assumed) infringement is not a prejudicial change of condition so as to authorize the defending infringer to invoke the defense of laches against a patent owner. Shaffer v. Rector Well Equipment Co., 5 Cir., 155 F.2d 344.

### RES JUDICATA

A former action entitled American Crankshaft v. Standard Crankshaft & Hydraulic Co. et al. was instituted in the Superior Court of Mecklenberg County on February 4, 1949. The only issue answered by the jury in the prior suit was the following: "Is the plaintiff the owner of a valuable trade secret, to wit; a process of restoring worn crankshafts as alleged in the complaint? No."

Where, as here, the second action is on a different cause of action, the doctrine of *res judicata* does not apply. Any conclusive effect of the prior judgment as between the same parties must rest on the doctrine of "estoppel by judgment", and for this doctrine to be invoked it must be made to appear clearly that the precise issue involved in the present suit was litigated and actually determined by the prior judgment. 30A Am.Jur. Judgments sec. 373; A.L.I. Restatement of the Law of Judgments, sec. 68 (1942); Handby v. Commissioner of Internal Revenue, 4 Cir., 67 F.2d 125, 129 (4th Cir.1933).

An action for trade secrets involves different legal principles and turns upon different facts than does an action for patent infringement. It is plainly apparent that the plaintiff is not estopped by judgment from the prosecution of this patent infringement action. 30A Am. Jur. Judgments sec. 381; Dixie Sand & Gravel Co. v. Holland, 255 F.2d 304, 310 (6 Cir., 1958).

Counsel may submit an appropriate judgment in accordance with this opinion.