## BLAW-KNOX COMPANY, Appellee,

v.

## HARTSVILLE OIL MILL and the French Oil Machinery Company, Appellants.

### No. 11680.

United States Court of Appeals
Fourth Circuit.

Argued Feb. 8, 1968.

Decided April 2, 1968.

Karl B. Lutz, Pittsburgh, Pa. (Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa.; Philip Wilmeth and T. Russell Foster, Hartsville, S. C., on brief) for appellants.

Walter J. Blenko, Pittsburgh, Pa. (Frederick B. Ziesenheim, Arland T. Stein, and Blenko, Leonard & Buell, Pittsburgh, Pa.; John T. Roddey, and Roddey, Sumwalt & Carpenter, Rock Hill, S. C., and Wm. Henry Venable on brief) for appellee.

Before HAYNSWORTH, Chief Judge, and BRYAN and BUTZNER, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

Means and methods for extracting oil from soybeans and cottonseed, by the use of solvents, are the subject of patent No. 2,840,459 issued June 24, 1958, on the assignment of George B. Karnofsky, to Blaw-Knox Company, Pittsburgh, Pennsylvania. Under it Blaw-Knox (BK) manufactured the Rotocel extractor and sued French Oil Mill Machinery Company, Piqua, Ohio, for infringement by French's product fashioned from patent No. 3,021,201 procured by Charles B. Upton, February 13, 1962.[1] The District Court upheld BK's patent against French's counterassault on its validity and also found French an infringer.

We disagree only on the finding of infringement. The plaintiff did not contend that its patent read on Upton. Reliance was put solely on the doctrine of equivalents, but Upton's equivalence of Karnofsky was not proved.

Oil of this kind is used principally in the manufacture of margarine, salad oils and shortenings. Extraction by solvents was first commercially successful about

---

1. The suit was begun against Hartsville Oil Mill at Hartsville, South Carolina. French intervened in fulfillment of the patent protection provision in the contract for the sale and installation by French of an extractor for Hartsville. It has been stipulated that French shall be the real defendant.

1900 in Germany. An exoteric's description of the operation follows.

Basically, the process is to percolate a solvent, such as hexane, a gasoline derivative, through seed containing oil, for instance, soybeans or cottonseed. Usually the seed has been converted into flakes, something like corn flakes, which expose a greater surface to the solvent than does the unprepared seed. The flakes are placed in a container and the solvent passed through them. In this contact the oil in the seed is dissolved and removed by absorption in the solvent. This solution of solvent and oil—known as miscella—is run through the flakes again and again. According to the number of runs warranted, the first product is designated as quarter miscella, the next as half miscella and, if no more runs, the last is the full miscella. When satura-tion is complete, the miscella is drawn off, the solvent captured for reuse through evaporation. Likewise, the spent flakes are collected and treated for sale as stock feed.

This rudimentary principle is applied with a precise technique requiring complex structures of considerable dimensions. For instance, although its size may be varied, the Karnofsky patent in one embodiment is cylindrical in shape, approximately 25 or 30 feet in height with a horizontal diameter of about 40 feet. It treats several hundred tons of seed daily in a continuous operation.

The Karnofsky machine, labeled the "Rotocel", is composed of upright cells, arranged as segments of a cylinder, with a central vertical axis and common division walls. The cells are the containers

## THE KARNOFSKY "ROTOCEL" EXTRACTOR

and, open at the top, are pie-shaped, pointing towards the centre with the arc at the outside. They are attached at their apex to, and are rotated by, a pow-

**879**

er-driven central, vertical, axial shaft. The whole structure is enclosed. As the cells revolve the seed flakes are fed into them. At the same time the solvent is sprayed from above upon the flakes.

The floor of each cell is perforated, and as the solvent leaches through the seeds in the cell, it picks up the oil, forms the miscella, and drips through the floor holes into containers below the rotating cells. Until full, the miscella is repumped to the top to be sprinkled again upon the oil-bearing material.

On their outside rim the cells rest on wheels running on a track. The cell floors are hinged on one side, and after a cell has been drained of its miscella, a gap in the track allows the other side of the cell floor to drop, emptying the spent flakes. The blow of the fall also shakes the residual loose from the floor. The wheel then ascends on a ramp-like segment of the track and re-closes the floor. Residual so deposited is then carried from the unit to an appropriate container. All of these movements are uninterrupted.

The esoteric's description of the operation is found in claims 8 and 32 of the Karnofsky patent, respectively typical of the apparatus and method claims of the patent. They are as follows:

"8. A continuous solvent extractor for vegetable oils or the like, comprising, a rotor having a substantially vertical axis, a plurality of substantially vertically and radically divided cells disposed around said axis, said cells being open at the top and adapted to contain oil-bearing solid material for intimate contact therein with solvent and solvent solution of varying degrees of richness during the rotation thereof, a perforated closure adjacent the bottom of said cells adapted to permit the continuous draining of said solvent and solvent solution through said cells, a plurality of compartments positioned adjacent the bottom of said cells along the path of their rotation and adapted to collect said solvent and solvent solutions draining from said cells, means connected to a majority of said compartments for circulating the contents thereof to said cells at a plurality of separated positions respectively along said path of rotation to effect substantially countercurrent flow of solvent and solvent solution of solid material."

"32. In a continuous system for the solvent extraction of oils or the like from solid particles, the steps comprising, separately confining a succession of masses of solid oil-containing particles independently from one another, moving said succession of masses through a closed rotary path in a substantially horizontal plane, supplying a flow of solvent substantially from above to each of said succession of masses at spaced intervals along said path of rotary movement, repeatedly draining solvent so supplied from said succession of masses into a succession of separate solvent-receiving zones positioned beneath said succession of masses and along said rotary path, and circulating solvent from a plurality of said separate solvent-receiving zones to a plurality of said supplying steps."

Concededly, this is a combination patent. It is attacked by French as having no novelty, only utilizing old horizontal processes in a merry-go-round movement. French alleges that the combination is not patentable because "the several elements of which it is composed" do not "produce by their joint action an * * * old result in a * * * more advantageous way". Colgate-Palmolive Co. v. Carter Products, 230 F.2d 855, 862 (4 Cir. 1956), cert. denied, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956). The District Court found to the contrary.

We think a consideration of the "content of the prior art * * *; differences between the prior art and the claims at issue * * * and the level of ordinary skill in the pertinent art" reveals that the Karnofsky patent possesses novelty, usefulness and a more desirable means and method of extraction than theretofore available to oil producers. Cf. Graham v. John Deere Co.,

383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

By 1938 the principal extractor types in operation in the United States consisted of Bollmann British patent No. 156,905, issued in 1921 and the German Hildebrandt. We do not descant upon the latter. Its modus operandi is plainly so foreign to the extractors in suit that discussion of it would be valueless. Suffice it to say, that Hildebrandt has been likened, and not entirely inaccurately, to a meat grinder. U-Shaped, the seed flakes are fed into it from the top of the lefthand column and work down by gravity. Additionally, motored screws push them down and around the U. The solvent, introduced in the righthand column, in seeking its level, meets the seeds, and saps them of the oil as they are forced through the liquid.

The Bollmann, still in use and effective, is known as a vertical basket type extractor. Four or five stories tall, it moves a series of baskets or buckets, with perforated bottoms, vertically on an endless chain. These containers go down on one side and up on the other. The extractable material is fed into the baskets as they begin to descend on the righthand side. As they descend half miscella is sprayed into them. After reaching the lower end of the chain, and as they ascend the other side, pure solvent is sprayed into them. This is the source of the half miscella just mentioned.

Thus the solvent trickles from each basket into the successive ones. These drippings are finally caught in a container below the vertical column of baskets. The baskets then pass over and around the upper sprocket of the chain, where the spent flakes are emptied. Then they descend again, again are filled with the oil material, and the process repeats itself.

Height is a significant feature for it allows the length of chain necessary for adequate percolation. Aside from the problem of siting it, excessive spillage occurred. The device's merit was that it established a counter flow of solvent against seeds. In comparison, the Karnofsky or Rotocel machine, can be made in a variety of sizes and involves no serious spilling problem.

Without attempting further to demonstrate the attractive elements of the Karnofsky over the Bollmann machine, we think the patentability of the Rotocel may rest securely upon the statutory presumption of validity. 35 U.S.C. § 282. That support is particularly strong because of the scrutiny the application received in the Patent Office. Subjected to interference proceedings with two other applications, it came out the winner. It was before the Patent Office for study for nine years and ranged against many other designs.

Moreover, the evidence satisfies us that there was an industry demand for an extractor with a performance superior to the Bollmann, and that the Rotocel met it with substantial commercial success.

Turning now to the accused structure of French, it may be helpful here, too, to give in lay terms its appearance and operation. Like BK's Rotocel, French's

## UPTON STATIONARY BASKET EXTRACTOR

Upton apparatus is cylindrical in form. The theory of extraction is the same in both patents. Indeed, Upton's patent was drafted after he had observed the Roto-

cel's construction and watched its performance. But the application of the theory is completely reversed in the two.

In the Rotocel the seed containers rotate, in Upton they do not move. It is a stationary extractor. The cells are permanently affixed to its exterior metal shell of the entire structure. Uncovered at the top and with dividing partitions, they are spaced around the center shaft as are those in the Rotocel. Likewise, each floor is perforated and hinged to one of its division walls, and at the given time it drops to dump the seed residue into a hopper below.

Upton rotates the seed supply spout, as well as the solvent distributors, instead of the cells. This is accomplished by means of a vertical drive shaft, extending from the top to the bottom through the center of the unit. Extending from the drive shaft are radial arms, which swinging over the cells, deposit in each of them, the requisite amount of seeds and then douse them with the solvent. This unitary mechanism, called the spider, is the common source of power and coordinates the operational movements in the extractor. Immediately below the cells a pan rotates as part of the spider. As in the Rotocel, the solvent seeps through the seeds, drains through the perforated floor, is caught below and recirculated until finally drawn off as full miscella. When the oil has been fully extracted from a given cell, its floor opens automatically. This results from the descent of a wheel, located on the cell floor, into a declination of the track rimming the rotating pan. As the wheel goes down it opens the floor and dumps the residual. As the track ascends, the wheel also climbs and re-closes the floor, thereafter held in place by latches.

The Upton patent in claim 4 provides the technical description of his product as follows:

"4. A continuous solvent extracting apparatus including a stationary housing, a series of stationary containers for the material to be treated fixedly mounted on said housing and arranged in a circular, substantially horizontal series and having perforate portions through which liquid may drain from said material, a carriage moveable about a pivot fixed with relation to said housing and forming approximately a center to said circular series, a material discharge member mounted on said carriage for depositing material to be treated successively into each of said containers, means including a hopper mounted on said carriage below said containers for successively receiving treated material from said containers, liquid receiving means on said carriage for collecting liquid discharged from said containers, a plurality of stationary annular troughs arranged below said carriage and to which liquid drained from different containers on said carriage is selectively discharged, each trough receiving only liquid discharged from containers according to their location on said carriage, whereby each trough will contain miscella of oil content differing from that contained in other troughs, another series of annual troughs mounted on said carriage above said containers, liquid propelling devices for transferring liquid from each of said stationary troughs to a specific trough on said carriage, conduits for supplying liquid from said other series of troughs on said carriage to some of said containers for treating the material contained therein with miscella of different concentrations, and means for removing treated material from said hopper."

Because of the similarity of the processes and theories, the plaintiff BK asserts, and the District Court has found, that Upton's machine is an equivalent of the Rotocel. We disagree for the reason that the Upton product has substantial differences.

In the French stationary extractor no movement of the large tonnage of seeds is required. This bulk remains in place to be treated, avoiding the need for the

considerable power necessary to rotate the heavily laden cells of the Rotocel. This absence of movement obviously saves also in maintenance and depreciation of the machinery. Movement of the spider with its distribution parts at the top and the carriage rotating below the cells is apparently light work in comparison.

The point is made by French that the rotation of the Rotocel causes appreciable vibration, especially while opening the cell floors. Undue vibration, it is argued, has the effect of shaking into the solvent "fines"—small particles of flakes —thus injuring the quality of the miscella. BK disputes this point, and decision here is not rested on this feature. Nevertheless, it does represent a noticeable difference in the two machines' execution and indicates one probable advantage of the Upton product.

At all events, while Upton resembles Karnofsky in the many physical aspects and features already noted, to our mind Upton's idea and concept for achievement of the extraction are so different as to take his structure out of the shadow of the equivalence of the Rotocel. The doctrine of equivalence grew from the need to assure and give a reasonable range to a patent. The principle is so clearly laid out by Justice Jackson in Graver Tank Mfg. Co. v. Linde Co., 339 U.S. 605, 607–608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) that it justifies this extended quotation:

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. * * * Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. * * * [A] patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935."

See also Long Mfg. Co. v. Holliday, 246 F.2d 95, 100 (4 Cir. 1957) with opinion by now Chief Judge Haynsworth.

The reverse mechanics and methods pursued by Upton to accomplish the same result as Karnofsky's proves beyond cavil that Upton's machine, although performing the same function as the other does not do it "in substantially the same way." For this conclusion we need not look beyond the working of the two machines. They are in contrast rather than in likeness of operation. Nor does the evidence disclose that "persons reasonably skilled in the art [of making extraction devices] would have known of the interchangeability" of the Upton operation with that of Karnofsky. Graver, supra, at 609, 70 S.Ct. 854; see 35 U.S.C. § 103 and cf. Graham v. John Deere Co., supra, 383 U.S. 1, 17, 86 S.Ct. 684.

Therefore, it is necessary to overturn as "clearly erroneous" the District Court's finding of equivalence. F.R.Civ.

884

P. 52(a). We will affirm the holding of validity of BK's patent, but decline the finding of French's infringement.

Affirmed in part and reversed in part.

HAYNSWORTH, Chief Judge (concurring):

While I concur in my brother Bryan's opinion, I feel that mention of the doctrine of equivalents is necessary, lest my position be misunderstood.

It readily appears from the majority opinion's discussion of the prior art that the Karnofsky patent was not a generic patent or anything approaching a generic patent. By substituting horizontal rotation of redesigned cells for vertical rotation of baskets, Karnofsky achieved efficiencies resulting in the recovery of a larger amount of oil with a lower cost of operation. While this represented a substantial, patentable improvement, it was not a revolutionary achievement. Had Karnofsky's discovery constituted a revolutionary development, I would have little difficulty in extending to it a range of equivalents sufficiently broad to encompass the Upton extractor, notwithstanding the fact that Upton embodied certain improvements. The presence of improvements does not necessarily avoid the question of an infringing appropriation, and seems to me relevant here only as showing that a reversal of the rotational elements was not an *obvious* equivalent of Karnofsky. Since the Karnofsky patent is merely an improvement patent and is restricted to a much narrower range of equivalents, Edwards v. Johnston Formation Testing Corp., CCA 5th, 56 F.2d 49, I agree that the Upton device does not constitute an equivalent which infringes the Karnofsky Rotocel. I reach this conclusion not just because Upton represents an improvement over Karnofsky, but rather because Upton's inventive advance was necessary to achieve the same relative motion by a reversal of the rotational elements. This takes Upton outside the narrow range of equivalents which may properly be assigned to Karnofsky.