**WRIGHTWAY ENGINEERING CO.**

v.

**MELARD MFG. CORP.**

Civ. No. 13047.

United States District Court
E. D. New York.
March 10, 1954.

Kenyon & Kenyon, New York City, Davis, Lindsey, Hibben & Noyes, Chicago, Ill., Ralph L. Chappell, New York City, George N. Hibben, Chicago, Ill., and Albert J. Fihe, Burbank, Cal., of counsel, for plaintiff.

Ethel Shames, New York City, Bair, Freeman & Molinare, Chicago, Ill., Will Freeman and Norman Lettvin, Chicago, Ill., of counsel, for defendant.

GALSTON, District Judge.

This is an action for infringement of the Goodrie patent No. 2,510,395, issued June 6, 1950, to the Wrightway Engineering Company on an application filed by Goodrie, November 13, 1947. The patent is entitled "Water and Air mixing Device".

Defendant's answer raises the usual defenses of invalidity and non-infringement, and includes a counterclaim for a declaratory judgment. Thus the issues for determination are validity and infringement of the patent in suit.

The specification recites that the invention described in the patent in suit is an improvement over Goodrie's prior patent No. 2,134,182, granted October 25, 1938.

The principal object of the invention is the provision of an apparatus which can be used as a vacuum breaker for toilet bowls or similar equipment where there is a possibility of back siphonage and subsequent contamination of the entire water system.

Another object of the invention is the provision of a fluid mixing device in which aeration of water can be accomplished when the water is being ejected from a faucet or when flowing through a pipe. A third object is to provide a fixture which will produce aerated water and at the same time include a non-splashing screen said to be desirable in connection with sink faucets. The last specifically named object of the invention is the production of a combination vacuum breaker and aerating apparatus which can be readily changed from a high pressure to a low pressure system with but a slight change in construction.

Generally speaking, the invention may be regarded as an aerating device. The defendant, a manufacturer of such devices, is alleged to have infringed all five claims of the patent.

It will suffice to select Claim 1 as the typical claim, since the remaining claims are dependent upon Claim 1.

Claim 1 reads as follows:

"An aerating device for faucets and the like comprising a casing having lateral air inlet ports and provided with a water inlet connection, a disc adjacent the ports having circularly disposed openings transversely of the connection for discharging fine parallel jets of water, a skirt within the casing spaced from the wall thereof adjacent the ports, an elongated body beneath the disc circular in cross section having a portion upwardly tapered on which the jets impinge and means at the outer end of the casing for uniting the air and water mixture into a coherent stream."

The patent in suit relates to an invention in an art embracing a number of prior patents. The plaintiff admits, as was said in counsel's opening statement, that the Goodrie patent in suit is not pioneer in character, since aerating devices of some sort for sink faucets particularly had been on the market for several years prior to the issuance of the patent in suit. Foremost among the dealers were Firestone Tire & Rubber Company, Chase Brass & Copper Company and the Chicago Faucet Company, under the prior art patents to Aghnides, Nos. 2,210,-846 and 2,316,382. The plaintiff's position though is that the Goodrie invention is an important improvement constituting a marked advance in the art, and that a new and unexpected result is achieved over the Aghnides type of aerator. So plaintiff contends that Goodrie's limited claims are not anticipated, and clearly define an invention entitled to protection, even having in mind the Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

The structure and the operation of the Goodrie aerator were very well described by plaintiff's witness, Professor Vuilleumier. He explained that the aerator consists of three major parts:

The casing 14, a perforated disc 18, a break-up and mixing plug 38, 28, below the disc a skirt 22, also depending from the disc and placed from and adjacent to the airports 24 in the side of the casing, and a screen 42 at the outlet end of the casing which is restricted in size.

The numbers designated are those used in the patent itself.

In operation, water enters the upper or inlet end of the casing and reaches the upper side of the disc. It is forced by pressure in the entering pipe through numerous small perforations in the disc which create fine separate jets of water below the disc. These jets are completely surrounded by air which enters the casing and passes downwardly under the lower end of the skirt and then upwardly into the annular space between the plug, the disc and the skirt. The witness asserted that in this space the separate jets are completely surrounded by air which becomes entrained in the jets as they pass downwardly toward the plug upon which they impinge. This impingement produces splashing, and some of the water is thrown upwards against the disc, while some water in the form of spray or droplets is thrown outward against the skirt, and some clings to the side of the plug in a thin film and passes downwardly. The witness explained that the patentee relied upon solid, non-clogging elements for aeration of the water and not upon screens, as in the commercial prior art, which will be referred to hereinafter as the Aghnides devices. The patent itself, in referring to the screen, observes that the screen 42 can be used or not as desired, and that it does provide an anti-splash feature. Professor Vuilleumier said that the single screen 42 provides additional resistance to the flow of aerated water and tends to give a slower stream and to assist in splash prevention.

During the trial, demonstrations of various models of the patent in suit on a test apparatus comprising a basin, two faucets and two pumps were made by Professor Vuilleumier, using first an early commercial model of the plaintiff's (Exhibit 7), made substantially like that shown in fig. 4 of the patent. The stream that emerged showed aeration and formed a "coherent" jet full of small air bubbles. The stream was creamy or whitish in color, due to the presence of the air bubbles. Even without the screen at the outlet end, the emerging stream was similar in appearance. The stream emerging from the other faucet without the aerator was grayish, and splashed, and was not coherent.

The accused device, compared with Claim 1 of the patent, may be classified as an aerating device for faucets. It comprises a casing, and the casing has lateral air inlet ports. There is also provided a water inlet connection. It has a disc adjacent to the ports, having circularly disposed openings. These openings, it is true, are not distributed in the manner shown in the patent in suit, but I cannot see that the accused device escapes the terminology of the claim because of the specific arrangement of the ports in circular order about the outer circumference of the disc. And these openings do, for a certain distance at least, discharge fine parallel lines of water, and are then deflected inwardly toward an enclosed plug by means of a guide ring or, to use the terminology of the patent in suit, a skirt. The aerated mixture finally passes through a screen at the restricted opening at the end of the casing.

The defendant contends that the accused device escapes infringement because Claim 1 calls for a disc for discharging fine parallel jets of water, and secondly because it calls for a skirt within the casing spaced from the wall thereof adjacent the ports.

I suppose it could be conceded that the parallel jets are not projected in parallel alignment to the same relative distance as that indicated in the patent. However, I cannot escape the conclusion that as the jets emerge from the openings from the outer edge of the disc, to some extent they certainly are parallel, and are substantially parallel until they get to the mixing plug.

Does the accused structure have a "skirt" within the meaning of the specification of the patent? The defendant argues that the skirt, as disclosed in the drawings of the patent in suit, extends within the casing from above the airports down past the airports. Defendant points out that their so-called skirt begins below the airports and is located wholly below them. However, I think this asserted difference in structure shows nothing but colorful evasion without any substantial change in mode of operation or result. If Claim 1 is read broadly, then in respect to the position of the skirt we find the only requirement is that it be "adjacent the airports".

Nor is the defendant's position in respect to noninfringement improved by a consideration of the functions of the accused device as compared with that of the patent. The demonstrations following the trial, of defendant's Exhibits U, V and W, afford no ground for changing this conclusion.

The spaced and separate jets of water and entrained air from the time they leave the disc until they strike the break-up plug in both devices are similar. Defendant's proofs fail to explain how its structure differs essentially from the structure of the patent. It is the structure which is the ultimate determinative on the question of infringement.

However, that brings us to the next critical question of the case. Is the patent in suit valid?

The defendant in its brief writes:

"The claims of the Goodrie patent in suit, if limited to the particular minor design features disclosed, may possibly be valid (although not by the Supreme Court's standard of invention), but if the terms and limitations of the claims are broadened,

or even disregarded by patentee in an effort to read upon defendant's accused device, then the claims are invalid in view of the prior art."

The prior art teaches a great deal of what is revealed in the specification of the patent in suit. Of particular importance I find the Aghnides patent No. 2,210,846 and a patent to Goodrie No. 2,134,182, granted October 25, 1938.

The Aghnides patent, granted August 6, 1940, sets forth that the invention consists of a device intended to be connected to a source of liquid under pressure, such as an ordinary water tap, and includes a chamber provided with one or more apertures through which the water is forced with substantial velocity. Openings are provided leading into the chamber from the outside air so that the flow of water will draw air into the chamber. Means are provided in the path of the stream of water after it leaves the aperture or apertures "for finely breaking up the water and offering sufficient resistance for thoroughly mixing it with air". Aghnides also appreciated that it was advisable in providing an outlet for the chamber from which the water mixed with air can emerge, that it be of smaller cross-section than that of the chamber, so that the water will flow in a "coherent" stream.[1]

Another prior art patent on which the defendant heavily relies to prove anticipation is an earlier patent to Aghnides, No. 1,912,113, issued June 11, 1931. This invention relates to water pumps, in a field not too unrelated to the devices covered by the patent in suit. This device consists of an arrangement by which jets of mixed water and gas are directed in an annular space or canal so that the transverse section of the central portion, considered in the same direction as the flow of water and gas, first increases, then diminishes. To realize his object

---

1. Since the trial of the present action, the United States Court of Appeals for the Seventh Circuit, in an opinion filed Feb. 24, 1954, has held Aghnides Patent No. 2,210,846 invalid in the action of Aghnides v. Goodrie, 210 F.2d 859. It is interesting to note that the trial court,

on the report of the special master, Casper W. Ooms (former Commissioner of Patents), found that all the elements of Aghnides were old in the art in the Felton British patent No. 6012 of 1909, and Solomon British patent No. 405,316 of 1933.

he provides in the canal a pear-shaped deflector. The canal is provided with an outlet opening smaller than the larger section of the central portion. The outlet is provided with a wire gauze which acts as an anti-spout device.

The third Aghnides patent, No. 2,316,832, issued April 5, 1940, is for a fluid mixing device, and is stated to be an improvement on his patent No. 2,210,846. The invention relates to a device for bringing about an intimate mixing of a large volume of air with water, and is used for producing a jet of water containing air bubbles. The lower portion of the device is provided with air inlets and a diaphragm having five spaced wire screens.

Also an important part of the prior art is an earlier patent to Goodrie, No. 2,134,182, issued October 25, 1938. It is said in this specification that the invention relates to an improved unitary flush valve connection known as a vacuum breaker. In his testimony at the trial Mr. Goodrie admitted that the device of this patent did embody a co-mingling of air and water, and so must be classed as an aerator. He admitted that the co-mingling produced a whitish stream of water. The lower end of the casing was restricted in order to bring about that result. In the device covered in the earlier Goodrie patent a portion of the water, he said, would hit the shoulders. Goodrie also admitted that when the water came through in jet formation it hit the plug, which is the center portion of the unit, before hitting the shoulder of the casing. This earlier device also took in air through airports.

In the patent in suit Goodrie stated that the improvement over his earlier patent is that

"The screen between the inner and outer casing has been eliminated, and the outer casing has been tapered, so that the water flowing through the plurality of openings in the upper part of the casing is discharged through the nozzle, flared against the outer casing, and thoroughly mixed with air before being discharged. The elimination of an internal screen removes any possibility of stoppage or blocking."

The plaintiff argues that Claim 1 contains structural differences from the earlier device because it calls for an aerating device having in combination a disc with circularly disposed openings for discharging fine parallel jets of water, an elongated body upon which the jets impinge, and means at the outer end of the casing for forming a coherent stream. But the disclosure in Goodrie's patent No. 2,134,182 is of an aerating device with a casing having air inlet ports. In the file-wrapper of the patent in suit it appears that the examiner found that members 31 and 20 of the reference correspond to the perforated disc 18 and flange 22 of the patent in suit, and perform the same function; also that the openings 38 in the earlier Goodrie patent correspond to the openings 20 of the patent in suit. The examiner said:

"the size of the openings is but a matter of degree. Applicant has changed the device of the patent by making the flange, which has the openings 38, separate from the vertically disposed portion 31, and by making the flange integral with the depending flange member 20. These changes are differences in design only and are not considered to amount to invention."

The applicant's attorney pointed out that the earlier Goodrie construction does not include the perforated disc 18, which causes individual streams of water to impinge upon the water break-up body 28. He argued too that the claim in the Goodrie pending application described the skirt 22 as depending from this perforated disc, and concluded that the construction of Goodrie's earlier patent and the construction of the patent in suit differed, and though the earlier patent was suited for a vacuum breaking structure,

"it has been found by experiment that the operation of water presents a somewhat different problem. This problem was solved by the inventor when the present construction was

devised. The structure of inventor's prior patent will actually aerate water, but the present application presents quite an improved structure, and it is believed that claims specific to the improved structure should certainly be considered, particularly as there is nothing better in the art than applicant's known prior patented invention."

Nevertheless in the next Patent Office action the Goodrie patent was relied on to reject new Claims 11–14 in the action of the examiner on November 18, 1949. However, a supplemental amendment was filed following a personal interview of the attorney with the examiner, which resulted in the allowance of the claims in suit.

The matter then, so far as the bearing of the earlier Goodrie patent on the patent in suit is concerned, narrows itself down to pretty much this question: are the specific differentials in structure as defined in Claim 1 of the patent in suit of such a nature as to meet the test of invention laid down in Supreme Court decisions. If Goodrie's improvement as described in the patent in suit was one that had long been needed in the art, then, of course, it could not be said that the solution of the problem was obvious. On the other hand, if there is no such showing of a long established need in the field, then there is no escaping the inference that the alleged improvement must be carefully scrutinized before the accolade of invention can be bestowed upon it. I think it cannot be gainsaid that, as Goodrie stated in his specification, there was an advance over what he had previously attained. But his contribution was wholly mechanical, and the contrivance of a device having circularly disposed openings to enable fine jets of water to be discharged, with the particular combination of skirt, air inlets, with an enlarged body portion beneath the disc which tapered off, and means at the outer end for uniting the air and water mixture into a coherent stream, insofar as it showed any advance over the earlier Goodrie patent must be classed within the skill of the mechanic educated in the field rather than as a result of invention.

If Claim 1 falls, then Claims 2, 3, 4 and 5, which are dependent upon it, likewise must fall. The provision in Claim 2 for a restriction of the internal diameter of the outer end of the casing was sufficiently shown in Claflin patent, No. 881,548, and in the three Aghnides patents heretofore referred to.

Claim 3 containing the limitation of a restriction of the end of the casing below the end of the elongated body, and providing a mixing chamber for the air and water, is met in Aghnides No. 1,912,113. Claim 4 limits the skirt as being directly connected to the disc. An equivalent construction is shown in Aghnides No. 1,912,113, the early Goodrie patent heretofore discussed, and Gettins No. 2,564,060.

Claim 5 defines the skirt as depending from the disc, and is sufficiently shown in the first of the Aghnides patents, the early Goodrie patent, and Gettins No. 2,564,060.

It is interesting to note that some foreign patents bear generally on the subject of aerated devices in anticipation of the general principle, at least, of the patent in suit. British patent No. 405,316, to Solomon contains this description of the operation of the device described:

"When a tap provided with the device is opened, liquid will flow through a set of passages, 4, that extend from end to end of the solid part, 2, of the cylinder, 1, and will impinge on the transversely disposed pegs, 8, causing turbulence of the liquid. At the same time air will be drawn through the other set of passages, 5, and become mixed with the liquid, thereby aerating same and causing a foam or froth to be formed on the upper part of the liquid when the latter is drawn off into a glass or vessel placed below the device."

In conclusion, though I find Claims 1, 2, 3 and 5 infringed, I believe the claims of the patent lack invention and are, therefore, invalid.

The plaintiff's expert, Professor Vuilleumier, placed considerable stress upon the importance of what is characterized as an "initial mixing and breakup chamber." The reference is to the annular space bounded by the perforated disc 18, the plug 28 and the skirt 22. He contended that as the aggregate area of the small openings in the disc is less than the annular area formed by the disc, plug and skirt, the limited amount of water passing through the small holes of the disc, in the form of separate jets, is insufficient to fill the space completely with water. Consequently, it is said, air from the airports 24 is caused to pass upwardly into this "mixing and breakup chamber" for entrainment and mixing with the jets of water.

There is nothing in the specification expressly teaching that there is an important relationship between the area of the openings in the disc and the area of the annular space formed by the disc, plug and skirt. Nor does the patent specification refer in express terms to an "initial mixing and breakup chamber". However, the plaintiff's expert witness testified that such teaching is inferable from the drawings of the patent and the general knowledge of a person skilled in the art. The witness conducted water tests of models of the patent to demonstrate that the water emerges through the openings in the disc as separate jets completely surrounded by air, and that as the jets of water entrain air and are broken up, additional air is sucked downwardly from the airports, around the lower part of the skirt and upwardly into the annular chamber.

Obtaining a good aerated stream by two or more stages of mixing and breakup of the liquid is not novel. For example, Aghnides patent No. 2,210,846 relates to a device where this is accomplished by the use of screens or plates as barriers. Felten British patent No. 6,012 discloses a device for aerating liquid by the use of a series of plates, arranged one under the other so that the "liquid jet" will be broken up into "several divisional currents" as the fluid strikes the successive plates in the presence of a flow of air.

The disc, plug and skirt combine to form the plaintiff's initial chamber where mixing and breakup occur. There would be no chamber, as defined, without these structural units; removal of either the skirt or the plug would eliminate or substantially alter it. With respect to the skirt, Professor Vuilleumier testified:

"Removal of the skirt in the Goodrie patent (in suit) would interfere somewhat with satisfactory operation, but you would still get very similar aeration of water as it went through the device."

As to the plug, the patent specification states:

"When connected to an ordinary water faucet, as illustrated in Figure 1, and with the central plug 28 removed, the water is discharged through all passages and furnishes a perfect aerated mixture. A nonsplash screen can be used if desired."

From these statements of the expert witness, as well as from the patent itself, it would seem that the "initial mixing and breakup chamber" is not the critical feature of the patent that the plaintiff would now make of it. It has already been observed that the patent specification fails to disclose either the nature or importance of any such chamber, and though such omission would not of itself ordinarily be sufficient to prove invalidity, still, in view of what has been said of the prior art, it cannot be maintained that the presence of an "initial mixing and breakup chamber", as described by the plaintiff, makes the patent in suit such an advance in the art as would entitle it to be regarded as invention.

Appropriate findings of fact and conclusions of law will be filed concurrently with this opinion.