**Elie P. AGHNIDES**

v.

**F. W. WOOLWORTH COMPANY.**

**Civ. A. No. 21076–N.**

United States District Court,
D. Maryland.

Dec. 1, 1971.

Richard S. Wright, Baltimore, Md. and William D. Hall, Washington, D. C., for plaintiff.

David F. Albright and Semmes, Bowen & Semmes, Baltimore, Md. and George N. Hibben, Albert W. Bicknell and Hibben, Noyes & Bicknell, Chicago, Ill., for defendant.

NORTHROP, Chief Judge.

To one not overly familiar with the mysteries of patent law, the trial of a patent infringement suit must be a baffling ritual indeed. More often than not, the evidence—testimonial, documentary, and demonstrative—is so voluminous that it could fill a bottomless pit. Indeed, this Court has frequently, in a

jocular vein, accused patent counsel of throwing everything into a case, including the kitchen sink. Sure enough, a case has finally come along in which counsel have thrown in a real, functioning kitchen sink, complete with its own self-contained three gallon water supply and a recirculating pump. Let us now explore the factual background of this controversy to discover how this ordinary piece of kitchen decor came to find a happy home (for a few weeks) in a federal courtroom.[1]

## I.

## FACTS

The plaintiff in this case is Mr. Elie P. Aghnides. Although the face of Mr. Aghnides may not be as familiar to the American housewife as that of Betty Furness (or her latter-day replacement, Frank Gifford), the manifestation of Mr. Aghnides' inventive genius, in one of its several variants, is surely a thing with which any person who has ever washed a dish (and even Judges do that on occasion) must be familiar. Mr. Aghnides is the inventor of what was characterized at the trial by a plumbing fixture expert, Dr. Stavrolakis, as one of the three most earth-shaking advances in plumbing in the last century, to wit, the faucet aerator.[2] Mr. Aghnides secured in 1940 two patents covering his basic aerator, which, marketed as the "Spring-Flo," found its way into many millions of homes. This aerator, according to U. S. Patent No. 2,210,846, not only produces a stream of water which is less likely to splash than that which emanates from an un-aerated faucet, but also enhances the foaming properties of the stream when the discharge is introduced into a soap solution and removes odors and gases from the water, thereby rendering it more palatable. As Judge Holtzoff said of Mr. Aghnides in Aghnides v. Watson, 188 F.Supp. 755 (D.D.C. 1960), "There is no doubt that the plaintiff invented a useful household article and has made a contribution." 188 F.Supp. 755 at 756. We agree that Mr. Aghnides' inventive genius has indeed contributed to the march of technology on the home front.

The basic patent on the old "Spring-Flo" aerator, U. S. Patent No. 2,210,846 (hereinafter referred to as "846") was held by the Seventh Circuit in the case of Aghnides v. Goodrie, 210 F.2d 859 (1954), to be invalid on the ground that it had been anticipated in the prior art, and that the invention claimed in 846 was no invention at all, but merely the result of mechanical skill applied to disclosed ideas. However, the Spring-Flo patent had smoother sailing through the plumbing of the federal courts in this circuit. The basic 846 patent was held *valid* in a well-considered opinion by Judge [later Chief Judge] Sobeloff in S. H. Kress & Co. v. Aghnides, 246 F.2d 718 (4th Cir. 1957). Thereafter, the plumbing industry accepted the decision of the Fourth Circuit and paid due homage (and royalty) to Mr. Aghnides as the recognized father of the aerator.

During all this time, one of the main competitors of the Aghnides aerator was the Goodrie aerator,[3] the inventor of which was Mr. Goodrie, founder and long-time president of Wrightway Engineering, manufacturer of the device sold by Woolworth and complained of as infringing the patent here in suit. At the trial of this suit, one of the principal bones of contention between the parties was whether or not the principle utilized both in the 846 Aghnides and the Aghnides here in suit (U. S. Patent No. 2,998,927 [927]) and the principle

1. Indeed, I am happy to have had the benefit of the kitchen sink in that it provided me with, as Othello would say, the "ocular proof" which was clear and convincing beyond refutation.

2. The other two key advances are, in descending order of significance, the single-lever faucet, and the ventilated toilet which electrically removes bad odors from one's bathroom.

3. U. S. Patent No. 2,510,395 [395].

utilized in the original 395 Goodrie and the accused Wrightway aerators for mixing the air and water was the same principle. More specifically, a prime issue at trial on the question of infringement *vel non* was whether or not the mixing means of the Aghnides-type aerator and the mixing means of the Goodrie-type aerator is the same, *viz.*, a screen located at the extreme downstream end of the aerator. I believe that I can resolve this issue at this point in this opinion, since much understanding of the considerations involved is to be gleaned from the reported cases dealing with the prior art Aghnides and Goodrie aerators. I shall, of course, also consider the result of expert testimony presented, and live demonstrations performed, at trial.

First, it would be a good idea to set forth the basic principles of aerator construction, and to show how the prior art and present Aghnides and Goodrie-Wrightway side-slot and air-from-the-bottom aerators differ from one another. Basically, an aerator is a device which is screwed onto the end of a faucet. Its purpose is to effectuate the mixing of a more-or-less great volume of room air into the stream of water passing through the body of the aerator, thereby producing a whitish, regular, concentric stream laden with numerous bubbles. An aerated stream splashes less than an untreated stream; the water is also rendered softer to the touch, and supposedly, its drinking qualities are improved by raising the dissolved oxygen content, thereby dispelling noxious gases and odors all too common in municipally-supplied water. Essentially, all the aerators in evidence in this case work in the same basic fashion. As the water flows, under pressure, into the aerator, it is broken down into numerous small jets by a de-

vice not unlike a diaphragm perforated with numerous small holes arranged in a concentric circle or circles. This is called the jet-forming means. From the jet-forming means, the water passes, still in jets, to the mixing means. It is the purpose of the mixing means to offer resistance to the jets of water. The resistance thus offered creates great turbulence in the space between the jet-forming means and the mixing means, which space we shall refer to as the mixing chamber.[4] In the mixing chamber, the now turbulent water is mixed with air sucked into the mixing chamber by virtue of the well-known Venturi principle,[5] thereby becoming aerated. The aerated stream is then discharged from the downstream end of the aerator as a coherent, bubbly stream.

In patent cases, it is useful to state the basic issue in simple terms; as the obfuscation introduced by reams of documents and masses of exhibits, not to mention mounds of expert testimony, all too often muddies the waters so badly that no amount of aeration could make them clear enough for anyone to understand. The basic issue in this case concerns the location of the air intake inlets in relation to the body of the aerator, and the means by which the air passes from these inlets to its necessary destination, the mixing chamber. In the prior art Aghnides aerator (846), as well as the prior art Goodrie aerator (395) the air was introduced into the mixing chamber by "side-slots," or air inlet ports cut horizontally into the side of the aerator body around its circumference slightly above the mid-section thereof. The patent here in suit (927) claims an improvement over the prior art method of introducing air into the mixing chamber whereby the air is in-

---

4. This is a term of our own invention.

5. The teaching of this principle, very simply stated, is that an alteration in the flow of a stream of fluid, by a narrowing of the stream, produces an increase in the velocity of flow together with a vacuum in the space surrounding the place of restriction. A Venturi-type device was de-

scribed in Emerson v. National Cylinder Gas Co., 251 F.2d 152 (1st Cir. 1958) as follows:

A venturi is a simple device having a nozzle and a chamber, and when gas [or other fluid] under pressure passes through the nozzle it creates a vacuum in the chamber. [251 F.2d 152 at 154].

troduced from the bottom of the aerator and passes thence upwards into the mixing chamber through passages between the mixing means and the outer shell of the aerator. Without at this point going into the questions of either patentability of this innovation or of infringement by the accused devices, the accused Wrightway aerators utilize the air-from-the-bottom technique of drawing air into their bodies from the downstream end of the aerator; they have no side-slots, and the air passes from the extreme downstream end of the aerator upstream to eventually get into the mixing chamber.

I now turn to the consideration of the question of just what constitutes the mixing means in the 927 Aghnides aerator and in the accused devices. It is not contended that the principle of the 927 aerator is different from that of the prior art Aghnides 846 aerator. In both, the jet-forming means is one or more perforated diaphragms. The mixing means is clearly one or more screens placed near the extreme downstream end of the aerator. The jets of water strike this screen or series of screens. The jets then are deflected back up into the space between the jet-forming means and the mixing means (the mixing chamber), into which air is introduced and in which aeration takes place. The only substantial difference between the 846 and 927 Aghnides patents is the location of the air inlets and the methods by which passages are formed to allow flow of air from the inlets to the mixing chamber. At any rate, it is clear that the Aghnides mixing means in the 927 patent is the same as that in the 846 patent, *viz.*, one or more screens at the downstream extremity of the aerator. Mr. Aghnides testified to this difference and this similarity in his testimony in rebuttal.

In the prior art Goodrie aerator (395), the jet-forming means is, as in the Aghnides aerators, a perforated diaphragm which forms the stream of water into jets. Immediately below the jet-forming device, and affixed thereto and supported thereby, is a plug which resembles a cone truncated at its upper extremity. The lower extremity of this cone is flush with the bottom of a circular member which surrounds both the jet-forming device and the cone. Between the outer circumference of the bottom of the cone and the inner circumference of the surrounding shield is an annular space, thus allowing passage of the fluid into an open space below the cone and above a single screen located at the downstream extremity of the aerator. The accused Wrightway devices are essentially the same in internal construction as their Goodrie forerunners, with the exception of the fact that, as a manufacturing expedient, the cone and shield device of the original Goodrie has been replaced with a one-piece injection-molded plastic part. This part consists first, of the familiar perforated diaphragm. Attached to the bottom thereof, and integral therewith, is a device resembling a solid automobile tire, of smaller circumference than that of the perforated diaphragm. This device is called by defendant the "plug," and was variously referred to at trial as the mushroom, the onion, and the plug. Immediately surrounding the plug part of this plastic device is, depending on the model of the accused device in question (Exh. A or Exh. B), a white metal or plastic ring, resembling a washer, the upper circumference of which is larger than the lower circumference thereof, thereby forming a sloping ring or shield around the mushroom. This leaves an annular space between the mushroom and the lower edge of the washer, through which the fluid passes on its way downstream. In the accused devices, as in the original Goodrie models, there is a single screen at the downstream extremity of the aerator. It is contended by defendants that the mixing means of their aerator is the plastic plug, *not* the downstream screen, which they characterize merely as a "stream

former." [6] Plaintiff, on the other hand, contends that the plug is not the mixing means of the accused devices.

At trial, the cross-examination of plaintiff's expert, Mr. McCann, elicited the admission that "some" mixing of air and water must be occasioned by the presence of the plug below the jet-forming device, which thereby creates the turbulence necessary to admix the fluids. It is defendant's theory that all the primary fluid admixture takes place in the space between the plug and its surrounding skirt, the air necessary therefor having been drawn up through the annular ring below the skirt and plug by dint of the Venturi principle at the same time as the admixed air and water is passing through the same annular orifice. Of course, the presence of the screen at the downstream end of the aerator cannot help but produce *some* additional aeration in the stream at the same time as it "forms" the stream. But, we are of the opinion that *the* mixing means in the accused devices is the plug and skirt assembly attached to the jet-forming means.

In making this finding, the Court has had the benefit of observing several demonstrations carried out with the help of the kitchen sink referred to previously. In these demonstrations, various alterations of the accused devices were placed on a faucet by means of a quick-disconnect snap coupling. Then, a stream of water at normal household pressure [7] was discharged through the model being tested. In one of these tests, the Court was shown models of the accused devices (Exhibits A and B) with and without the screen in place at the downstream extremity of the aerator. (Defendant's Exhibits 97, 99, 102 and 104). The Court could observe little difference in the softness or the whitishness or the bubbliness of the streams produced by the accused devices with and without their screens in place.

True, the screen increased the coherence of the discharged stream, but little observable change was made in the visible manifestations of aeration discussed above. It was the conclusion of defendant's witness, Mr. Gullaksen, and it is the conclusion of this Court, that the plug and skirt in the accused devices is the mixing means thereof.

This conclusion drawn from "the ocular proof" is buttressed by the reported cases. In Aghnides v. Goodrie, 210 F.2d 859 (7th Cir. 1954), it was held that the original Aghnides patent (846) was invalid, and, it was further held by the Seventh Circuit that, even were the 846 patent valid, it would not have been infringed by the Goodrie device insofar as Goodrie's aerator "prescribe[s] a different means for separating the incoming water into jets." 210 F.2d 859 at 863. It is obvious to this Court that the Seventh Circuit meant that the means for *mixing* the air and water differed in Goodrie from that in Aghnides. A look at the drawings accompanying patents 846 and 395 convinces me that both the original Aghnides and the original Goodrie taught the use of perforated diaphragms as jet-forming means. Thus, I can only conclude that the Seventh Circuit meant to say that it was not the jet-forming means, but rather, the mixing means, which differed between Goodrie and Aghnides. *See* S. H. Kress & Co. v. Aghnides, 246 F.2d 718 (4th Cir. 1957), in which the Fourth Circuit, disagreeing with the Seventh, upheld the validity of the original 846 Aghnides patent. The *S. H. Kress* court also held that the patent was infringed by an aerator which used an onion-shaped device, not unlike that of the accused devices in the instant case, to offer the necessary resistance to mix the air and water. I think that the Fourth Circuit recognized that *the* mixing means of aerators such as those accused in the instant case is the plug or onion,

6. The principle of using a screen as a stream former (to give an unwavering, steady quality to a stream of water and also to lessen splashing) is old indeed.

*See* Purser's British Patent #136,663 (1919).

7. *I. e.*, thirty pounds per square inch.

rather than the screens of Aghnides. Thus, in holding that the *broad* claims of the 846 patent were infringed, the *S. H. Kress* court pointed out that the resistance offered the jet streams in the accused "Mel-O-Flo" device came from the onion and the inner surfaces of the chamber, as well as from the single screen. 246 F.2d 718 at 724. I think that had the point been truly in issue in the *Kress* case, and had the Fourth Circuit been called upon therein to find a *single* component of the accused device and label it the mixing means, it would have, as has this Court, chosen the onion-shaped plug.

The pièce de résistance in this regard is found in the case of Wrightway Engineering Co. v. Melard Mfg. Corp., 119 F.Supp. 506 (E.D.N.Y.1954), aff'd, 219 F.2d 392 (2d Cir. 1955). In that case, Judge Galston held that certain claims of the Goodrie 395 patent (the progenitor of the current Wrightway internal workings) were infringed by the Melard accused aerator, but that the 395 patent was invalid for want of patentable novelty. In describing the workings of the 395 Goodrie aerator, Judge Galston adopted the testimony of a Professor Vuilleumier, who said:

> In operation, water enters the upper or inlet end of the casing and reaches the upper side of the disc. It is forced by pressure in the entering pipe through numerous small perforations in the disc which create fine separate jets of water below the disc. These jets are completely surrounded by air which enters the casing and passes downwardly under the lower end of the skirt and then upwardly into the annular space between the plug, the disc and the skirt. The witness asserted that in this space the separate jets are completely surrounded by air which becomes entrained in the jets as they pass downwardly toward the plug upon which they impinge. This impingement produces splashing, and some of the water is thrown upwards against the disc, while some water in the form of spray

or droplets is thrown outward against the skirt, and some clings to the side of the plug in a thin film and passes downwardly. The witness explained that the patentee relied upon solid, non-clogging elements for aeration of the water and not upon screens, as in the commercial prior art, which will be referred to hereinafter as the Aghnides devices. The patent itself, in referring to the screen, observes that the screen 42 can be used or not as desired, and that it does provide an anti-splash feature. Professor Vuilleumier said that the single screen 42 provides additional resistance to the flow of aerated water and tends to give a slower stream and to assist in splash prevention.

During the trial, demonstrations of various models of the patent in suit on a test apparatus comprising a basin, two faucets and two pumps were made by Professor Vuilleumier, using first an early commercial model of the plaintiff's (Exhibit 7), made substantially like that shown in fig. 4 of the patent. The stream that emerged showed aeration and formed a "coherent" jet full of small air bubbles. The stream was creamy or whitish in color, due to the presence of the air bubbles. Even without the screen at the outlet end, the emerging stream was similar in appearance. The stream emerging from the other faucet without the aerator was grayish, and splashed, and was not coherent. [119 F.Supp. at 508].

The tests conducted in our presence in the instant case confirm Judge Galston's conclusion that the presence or absence of the screen in aerators of the Goodrie type makes little or no observable difference in the indicia of aeration observable in the stream of water, although "coherence" may be affected thereby. Certain tests were conducted by Mr. Aghnides in rebuttal, wherein was used an accused aerator without an outer conduit or screen-containing basket, but comprising merely the jet-forming means and plug in conjunction with the

washer surrounding it in such fashion that the discharge immediately below the annular orifice was observable. It is the conclusion of this court from observing those tests, and we so find as a fact, that the discharge immediately below the annular space formed by the plug and washer is a *coherent,* aerated stream laden with numerous small bubbles. This coherency is observable for a distance of at least one-quarter inch, the distance from the annular orifice to the end of the aerator body in the accused devices. If, in fact, the stream were not coherent immediately below the annular orifice, it would spray into the air passages, thus destroying the means for bringing air up into the aerator body, and water would, as a result, be discharged through the air inlets, an effect which this court did not observe in any test models of the accused devices.

In affirming Judge Galston, the Second Circuit held that there was no invention in *substituting* the Goodrie plug for the Aghnides screen as a mixing means.

> Thus, the validity of the patent may be said to depend upon whether it was an "invention" to substitute "plugs," like those disclosed in several of earlier patents, in place of the bottom screens of Aghnides . . .. [219 F.2d 392 at 393].

Thus, it is obvious that the Second Circuit concluded as does this court that the plug is *the* mixing means in Goodrie-type aerators. The fact that the stream diverges below the one-quarter inch space does not disturb our finding of coherency immediately below the annular orifice.

## II.

## VALIDITY OF U. S. PATENT 2,998,927

■ This Court does not take lightly its obligation to protect the rights of one who, in the sound judgment of the United States Government, has been given the protection of the patent laws in order that he may, for a period of years, enjoy to the exclusion of all others, the fruits of his inventive genius. Nevertheless, this Court recognizes that not every exercise of skill, nor every new thought, deserves the award of an exclusive monopoly for the benefit of its originator. In recognition of this principle, the Congress has provided in 35 U.S.C. 103 that an advance in a particular art is not patentable unless that advance is truly the result of the exercise of the inventive faculty rather than the result of the application to a problem of the ordinary skill that one versed in the particular art could be expected to possess. This determination, particularly when judicially made *post factum*, is primarily the result of a factual inquiry. *See* Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).[8] After having waded through the mass of evidence adduced at trial, and after having considered two prior litigative battles waged by Mr. Aghnides, this Court is of the opinion that the Patent Office was in error in granting U. S. Patent No. 2,998,927 to Mr. Aghnides,

---

8. My reading of Graham v. John Deere Co. discloses that while the Court disavowed a judicial tightening of the concept of obviousness, it clearly intended to urge the Patent Office to tighten the standards which it had been following in its determinations of obviousness under 35 U.S.C. § 103. Mr. Justice Clark said:

> While we have focused attention on the appropriate standard to be applied by the courts, it must be remembered that the primary responsibility for sifting out unpatentable material lies in the Patent Office. . . . We have observed a notorious difference between the standards applied by the Patent Office and by the courts. While many reasons can be adduced to explain the discrepancy, one may well be the free rein often exercised by Examiners in their use of the concept of "invention." [383 U.S. 1 at 18, 86 S.Ct. 684 at 694].

This language indicates to me, at least, that perhaps the rationale underlying the traditional strength of the presumption of validity of a patent may be, in fact, somewhat weak.

and that the same is invalid, and that the presumption of validity attaching thereto has been rebutted by clear and convincing evidence. It is often said that the strength of the presumption of validity attaching to a patent is directly proportional to the degree of turbulence stirred up by the application therefor in the Patent Office; the stormier the history of the application, the stronger the presumption. *See, e. g.,* Universal Incorporated v. Kay Manufacturing Corp., 301 F.2d 140 at 148 (4th Cir. 1962). In the instant case, plaintiff's original application (907) was filed in 1953; after rejection of certain broad claims by the examiner, an appeal was taken to the Board of Appeals, which affirmed the rejection of these claims. This action was in turn affirmed by Judge Holtzoff in the case of Aghnides v. Watson, 188 F.Supp. 755 (D.D.C.1960), which I shall discuss in much greater detail *post.* After this action by Judge Holtzoff, the examiner was prevailed upon to allow certain claims (which eventually became the claims of the 927 patent here in suit) which are allegedly narrower than those previously rejected. Thus, if one accepts the maxim that Patent Office turbulence begets validity, this case seems one in which the presumption should indeed be strong. But this Court does not feel that a strengthening of the presumption is the only logical conclusion which can be drawn from the stormy history of an application in the Patent Office. Indeed, this Court sees no reason why precisely the opposite inference cannot be drawn. As Circuit Judge (then Chief District Judge) Craven said in Cook Engineering & Electronics, Inc. v. Hickory Foundry & Machine Co., 231 F.Supp. 271 (W.D.N.C. 1964):

It is sometimes said that the more investigation by the Patent Office the stronger the presumption of validity. Gulf Smokeless Coal Co., et al. v. Sutton, Steele & Steele, et al., 35 F.2d 433, 437 (4th Cir. 1929). But logically this is a two-edged sword. Five rejections over a four year prosecution period may strengthen the presumption of validity *or* make suspect the final allowance. The latter inference finds some support in common sense— certainly as to any broad scope necessary for the patent to have any real value. [231 F.Supp. 271 at 273].

▮ We agree with this conclusion, and thus find that the presumption of validity attaching to the patent here in suit is no stronger than usual, and indeed is rebuttable by clear and convincing evidence. The evidence is such in the instant case that we find the presumption rebutted. *See,* National Steel Corp. v. Baltimore & Ohio Railroad, 313 F.Supp. 934 (D.Md.1970).

▮ This Court concludes that the advances claimed in the 927 patent are, in light of prior art, including Aghnides 846, such that their existence should have been obvious to one skilled in the aerator art at the time the search was on. *See S. H. Kress, supra,* at 723. In making this determination, I am mindful of the criteria set forth by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) for determining whether or not a claimed invention is obvious within the meaning of that term as used in the patent law, especially 35 U.S.C. § 103.[9] First, I have determined that the aerator art in the post-war period was and has continuously been a crowded art, in which fierce competition has resulted

---

9. In Graham v. John Deere, Mr. Justice Clark said:

While the ultimate question of patent validity is one of law [citations omitted], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. [383 U.S. 1 at 17, 86 S.Ct. 684 at 694].

in a situation in which a mere penny or two saved in production costs is of great consequence. Obviously, then, the level of mechanical skill in the art at the time the patent here in suit was issued was rather high, as is evidenced by the history of cost-cutting engineering engaged in over the years by defendant Wrightway and by the testimony of plaintiff's witness, Dr. Stavrolakis, former head of the two million dollar per year American Standard research laboratory, as well as by early work carried on by Hjulian and others at Crane. From a study of all the evidence in this case, I am warranted in concluding that the prior art, including the Aghnides 846 and 832, the Bachli 854 and the Turek 135 patents, clearly indicated the path which Mr. Aghnides followed to the mechanical end, the result of which was the design of an air-from-the-bottom aerator. Further, the differences between prior art disclosures showing means of drawing air into a fluid mixing or aerating device by use of inlet ports located other than at the side thereof and the advances claimed by Mr. Aghnides in patent 927 are not, in the eyes of this Court, great enough to raise the disclosures of the 927 patent to the level of invention.

■ Our review of the evidence in this case in the light of the "secondary considerations" enumerated in *Graham, supra,* also leads us to the conclusion that the origin of the advance claimed by Mr. Aghnides was not the necessary flash of inventive genius. The commercial success of the Aghnides 927 models is unimpressive indeed, as is evidenced by the history of terminated license agreements for the manufacture of the device. It was shown at trial that the major domestic manufacturer of the 927 model, *viz.* American Standard, terminated major manufacturer of the 927 aerator a few years after its commencement, supplanting it with the Aghnides all-plastic "throw-away" model. Similarly, Scovill, another large domestic manufacturer, terminated its license under the 927 patent within a short time after the same

was granted, *viz.* three years. I am of the opinion from all the evidence that the Aghnides 927 aerator was not a commercial success, even though the general *principle* of introducing air into an aerator from the bottom might have been a commercially successful idea. It is not the idea which is so much in issue in this case as it is the device and means for putting this idea in practice. We are also convinced that there was no longfelt *need* for an air-from-the-bottom aerator, save in the limited field of aerators designed to be used in sterile areas of hospitals; this fact is evident from the sale of over 30 million of the original Aghnides 846 Spring-Flo devices despite the fact that they were all side-slot models. Likewise, we are not convinced, in light of all the primary considerations in this case, that the device here in suit is impressed with patentability by virtue of the fact that some aerator mechanics were apparently attempting to perfect an air-from-the-bottom device during the period of development of the 927 device. A patent is not a prize to be given for finishing first in a race, when the product of that race lacks the element of invention as required by law.

This Court views as highly persuasive in this connection the decision of Judge Holtzoff in the case of Aghnides v. Watson, 188 F.Supp. 755 (D.D.C.1960). In that case, Mr. Aghnides sought a judicial determination that certain of the claims in the original application for what eventually became patent 927 should have been allowed by the Patent Examiner. Although the decision of Judge Holtzoff in *Watson* is clearly not *res judicata* with respect to the claims of the patent which eventually were issued, and which are being relied upon in the instant case, the issues bear such striking similarity to the matter at hand that this Court is fully persuaded that not only was Judge Holtzoff correct in his denial of relief, but that the law compels this Court's conclusion of invalidity. To be sure, Judge Holtzoff was dealing only with certain broad claims of Aghnides in the *Watson* case, whereas we are here

dealing with an entire patent which comprises twenty relatively narrow claims. But, as I said at the outset of this opinion, it is sometimes beneficial in patent cases to strip away the shroud of jargon and technology in order to see the legal issues involved. Thus, it is worth repeating that the only real piece of innovation which distinguished the 927 aerator from the prior art 846 Aghnides is the fact that the air is drawn into the 927 from the bottom of the aerator. Much is made of the fact that, in order to make the air-from-the-bottom aerator of 927 operative, air passageways, integrated with the supporting means of various internal structures of the aerator, had to be designed, but the fact remains that the prime indicia of novelty in the 927 claims is the principle of bringing air into an aerator from the bottom.

Counsel for Mr. Aghnides argued that Judge Holtzoff had before him only broad claims of the original 907 application which, if allowed, would have granted Mr. Aghnides a patent on the principle of bringing air into an aerator, *anyone's* aerator, from the bottom. It is argued that Judge Holtzoff did *not* have before him a claim which combined the broad principle with details of construction calling for air passages up the *inner side wall* of the aerator body. Plaintiff thus seeks to have us give little weight to Judge Holtzoff's decision for the reason that he did not have the inner side wall construction detail before him in *Watson*, and, so the argument runs, it is this element of construction detail embodied in the claims of 927 here in suit which imports patentability over the broad principle held unpatentable by Judge Holtzoff.

This whole line of argument fails, however, when claim 20 of the 907 application, which claim was in issue and rejected by Judge Holtzoff in *Watson*, is carefully examined.[10] Claim 20 of the 907 application called for:

[A] resistance element (44) being positioned in said chamber [within the aerator body] and spaced therein downstream of said jet-forming means and supporting means (45) for said resistance element *carried by said body member* (48) [the body member being the aerator body itself] *and co-operating therewith to define an air passage within said body member from the outlet end of said body member around the resistance element* to said space between the jet-forming means and the mixing means. [Emphasis added].

It is evident that the plain language of this claim defines an air passage which starts at the bottom of the aerator and thence passes upward *between* the inner part of the body member and the supporting means for the mixing means. There is no way which we can ascertain that claim 20 can be read as calling for anything *but* an air passage between the supporting means for the mixing means and the inner side wall of the aerator body. It is immaterial that claim 3 of the 927 patent which was finally allowed by the Patent Office is not the word-for-word equivalent of this rejected claim 20 of the 907 application. The fact still remains crystal-clear that Judge Holtzoff *did* have before him squarely in issue in *Watson* a claim which called for an aerator embodying the principle of air-from-the-bottom *combined with* a detail of construction which defined an air passage along the inner side wall of the aerator body from the downstream end thereof to the mixing means. Thus, we are convinced that Judge Holtzoff did have before him in *Watson* more than the bare principle of air-from-the-bottom, to which plaintiff contends he confined himself. I conclude that the detail of construction calling for an air passage up the inner side wall of the aerator body was disclosed to Judge Holtzoff by claim 20 of application 907, and thus I am justified in giving persua-

10. See Defendant's Exhibit 50, a chart comparing these two claims.

sive weight to his opinion in *Watson*, *supra*.

I think it worthwhile to quote Judge Holtzoff at length to show the similarity of the issues involved in *Watson* and this case:

> The plaintiff . . . designed a further improvement in his aerator by eliminating the side slots completely and inserting in their place vertical slots surrounding the screen at the bottom of the container . . . . [T]he new construction constitutes a substantial improvement over the earlier structure.
>
> The question to be determined, however, is whether this improvement is the product of mechanical skill or is the result of the inventive faculty and therefore rises to the dignity of a patentable invention. Without any other prior art, . . . the Court would have considerable hesitancy in holding that it is a patentable invention to change the location of the slots through which the air enters the mechanism. [188 F.Supp. 755 at 757].

The prior art spoken of by Judge Holtzoff is found in two patents, *viz.* Bachli No. 2,541,854 (1951) and Turek No. 2,316,135 (1943). In *Bachli*, the air is introduced into the mixing chamber through passages leading from inlet ports located *upstream* from the jet-forming device, and is channeled from its point of entry into the mixing chamber. *Turek* was a patent for a showerhead (considered by the Patent Office to be an analogous art, *see* 188 F.Supp. 755 at 756) in which air was introduced into a mixing chamber through an annular space located at the downstream extremity of the showerhead, thereby making it an air-from-the-bottom device. These two patents were discussed at trial, and this Court feels that they clearly anticipated the improvement embodied in the Aghnides 927 patent, *viz.* introducing air into a fluid mixing device from the bottom thereof. Judge Holtzoff said with respect to these two prior art patents:

> . . . [T]he sole point for which the Turek patent is cited is that it suggests the thought of having openings to the open air in a vertical position at the bottom of the structure.
>
> Bearing in mind the Bachli patent as well as the Turek patent, but principally the Bachli patent, it is clear that the slots through which the air enters the stream may be located at various positions. The exact location becomes a matter of choice and a person skilled in the art would naturally choose that location which would give the best results. [188 F.Supp. 755 at 757].

Although the Court realizes that patent cases are, because of their uniqueness, of very little precedential value in subsequent cases, yet I can come to no other conclusion than that reached by Judge Holtzoff, *viz.* that the Aghnides air-from-the-bottom aerator is not a patentable device.

Research has turned up an ancient Supreme Court case which, although it obviously dealt with a different art from that involved in the instant case, is strangely close to the case at bar in its cardinal facts. In Belding Manuf'g Co. v. Challenge Corn-Planter Co., 152 U.S. 100, 14 S.Ct. 492, 38 L.Ed. 370 (1894), the plaintiff was complaining that an icebox sold by defendant infringed a patent owned by plaintiff. The United States Circuit Court for the Western District of Michigan dismissed the complaint, and the Supreme Court affirmed, holding that the plaintiff's patent (the Hambrook patent) was invalid for want of patentable novelty. For those too young to remember how a vintage 1894 icebox worked, perhaps we should mention that it worked on the principle of convection currents of air, which was depended upon to maintain a circulation of air whereby cold air was drawn from a compartment containing a block of ice down into a lower compartment containing the items to be refrigerated. The cold air flowed down from the ice compartment to the provision compartment, whence, now warmed,

it flowed back up to the ice compartment in a perpetual cycle. The icebox art was, by 1894, a crowded one, and the court found the Hambrook patent invalid as having been anticipated by several prior patents. One of the major advances relied upon by the plaintiff to sustain patentability was the fact that the air entered the ice compartment in prior art iceboxes from outlets at the middle of the top of the ice compartment, whereas in plaintiff's patent, the air entered at the sides of the ice compartment, near the top thereof. In rejecting the patentability of this improvement, the Court said:

> Nor do we think the distinction pointed out between the uptake flues or side passages in the Smith (prior art) and the Hambrook patents amounts to a patentable difference. The purpose of the flues is the same, and their mode of operation is the same. The fact that Hambrook did not prolong these air passages along the lid or cover might perhaps, be a better way of introducing the air into the ice chamber, but it does not amount to a patentable improvement.

As was said in Roberts v. Ryer (91 U.S. 150): "It was a mere carrying forward; a change only in form, proportions, or degree, doing the same thing, in the same way, by substantially the same means, with better results." [152 U.S. 100 at 106–107, 14 S.Ct. 492 at 494].

These words of the Supreme Court could be read almost word for word upon the facts of the instant case. It is true that introducing air from the bottom of a faucet aerator is a better way of bringing air into the device, from both a practical (cost engineering) and a sanitary viewpoint. But this Court is convinced that the idea lacks patentable novelty. From an overview of the patent here in suit, it is clear to this Court that patent 927 stands for the invention of an air-from-the-bottom aerator, and no more save whatever design adjustments might be mechanically necessary to accommodate the flow of air from the bottom of an aerator, *qua* aerator. This does not rise to the dignity of patentability. As I have noted above, at the trial of this case there was convincing evidence,[11] that one of the claims of the application #351,907 rejected by judge Holtzoff in *Watson, supra, viz.,* Claim 20, is virtually the word-for-word equivalent of Claim 3 of the 927 patent relied upon here, and it is clear that rejected claim 20 embodied the inner-side wall concept. Thus, I feel that I should follow Judge Holtzoff's reasoning in *Watson.* One further reason which convinces me that the patent here in suit should not be sustained was articulated by Judge Holtzoff in the following language:

> The Court might add another comment. In granting a patent on an *improvement* to the original inventor, the Patent Office would in effect prolong the original seventeen-year monopoly. Here the plaintiff has made a real contribution. He has been rewarded with the seventeen-year monopoly. But by getting a patent, if one was granted to him on a change in his structure, he would renew his monopoly. That is a result which would not be in accord with the intent of Congress and must be taken into consideration unless it is clear that the improvement is a real product of the inventive faculty. [Emphasis added; 188 F.Supp. 755 at 757].

It is noteworthy here that in the *S. H. Kress* case, *supra,* Mr. Aghnides put in issue the validity not only of his 846 patent, but also that of his 832 patent.[12] Although the court sustained the validity of the 846 patent, the 832 patent was invalidated on the basis that the improvements which it claimed over the 846 patent, *viz.,* the use of multiple diaphragms in the jet-forming

---

11. *See* Defendant's Exhibit 50, and the accompanying testimony of expert witness O'Brien.

12. U. S. Patent No. 2,316,832.

means and the use of an orifice to secure a better flow, were not the result of invention, but, rather, were mere mechanical improvements:

> [The 832 improvements are] too meagre a discovery to be regarded as invention. The changes seem to be the normal and obvious result of skill and experience gained in the practice of the '846 invention. They are entitled to no new patent, for they are variations in the application of the principle already disclosed, and are of no important consequence mechanically and should be accorded no significance legally. [246 F.2d 718 at 725]. (Citations omitted).

Mr. Aghnides was, of course, displeased with this result and argued for a re-hearing on this issue. Holding that it had correctly applied the rule as to co-pending patents, the Fourth Circuit denied re-hearing as to the issue. Some remarks of that Court are particularly apposite here:

> The policy of the law is to protect the inventor by granting him a monopoly for a limited term, but upon its expiration the public is entitled to practice his invention *in all its modifications and variations*. There is certainly no reason to grant him a monopoly for an extended period upon a variant of his patent which would be obvious to one skilled in the art. [Emphasis added; 246 F.2d 718 at 726].

Consequently, for the reasons stated above, it is the opinion of this Court that U. S. Patent No. 2,998,927 is invalid.

### III.

### INFRINGEMENT

■ Even were patent 2,998,927 valid, this Court would find that it is not infringed by the accused devices. At trial, claims 3, 4, 8 and 17 were relied upon as having been infringed by the accused devices. For the purposes of the present discussion, I shall refer to Stipulation Exhibit A as the "plastic model" and Stipulation Exhibit B as the "brass model." Insofar as the aerator art has be-

come a crowded art, I must construe the claims of patent 927 strictly. *See*, Computing Scale Co. v. Automatic Scale Co., 204 U.S. 609, 27 S.Ct. 307, 51 L.Ed. 645 (1907); Simmons v. Brandwein, 250 F.2d 440 (7th Cir. 1957). Therefore, construing the claims of 927 strictly, I find that certain elements and limitations contained therein do not appear in the accused devices, which therefore do not infringe the said patent. *See*, Bullard Co. v. General Electric Co., 348 F.2d 985 (4th Cir. 1965). Plaintiff argues that *every* patent must be allowed some range of equivalents, no matter how strictly its claims must be construed, and he cites as authority for this proposition the case of Skelton et al. v. Baldwin Tool Works, 58 F.2d 221 (4th Cir. 1932). But, in that case, Judge Soper said the following:

> It is no answer to [plaintiff's] case to point out that the inventions are not of a broad and primary character, and that the range of equivalents is necessarily limited; for every patent has some range of equivalents, *unless form is made an indispensable thing.* [58 F.2d at 227]. (Emphasis added).

If this Court were to assume the 927 patent in suit to be valid, it would thereby adopt that view of Judge Holtzoff's decision in Aghnides v. Watson, *supra*, which plaintiff argues we should adopt, *viz.*, that all that Judge Holtzoff said was that the broad *principle* of bringing air in from the bottom of an aerator, *qua* aerator, is, in and of itself, unpatentable, but that this principle, when combined with the details of *form* and construction found in the finally allowed claims of 927, then becomes patentable. In making this argument, plaintiff has made the *form* disclosed in the 927 patent, in the words of Judge Soper, "an indispensable thing." Thus, I am fully justified in construing the claims in suit as narrowly as possible in making my factual determinations and conclusions on the issue of infringement. Furthermore, the patent in suit being one for an *improvement* over prior art devices (see U.S. Patent 2,998,927, col. 1, 11, 21–23),

it must necessarily be allowed a much narrower range of equivalents than the ordinary patent. See the concurring opinion of Chief Judge Haynsworth in Blaw-Knox Co. v. Hartsville Oil Mill, 394 F.2d 877, 884 (4th Cir. 1968).

Claim 3 of patent 927 calls for:

. . . an air inlet passageway which is open to the atmosphere at the downstream open end of the conduit and extends adjacent to the mixing means and *enters said mixing space adjacent to the upstream side of the mixing means.* (Emphasis added).

It is clear that in an aerator which uses the Aghnides mixing means (the screen or screens), the air passageways claimed in the above-quoted part of Claim 3 would terminate at the upstream end of the mixing means. But, as already found (see Part I of this opinion), the mixing means in the accused devices is the mushroom-shaped plug. Clearly, the air passageways which bring air in from the bottom of the accused devices terminate *below* the mixing means, or, at the very most, at the midpart thereof. It is clear that the air inlet passageways in the accused devices do not terminate at the upstream side of the mixing means. Even though it is true that if the accused devices otherwise infringed the 927 patent, the use of a non-Aghnides (846) mixing means would not avoid such infringement, *see* In re Sweet, 157 U.S.P.Q. 495, 496 (C.C.P.A., 1968), the very fact that the accused devices use the plug-and-skirt mixing means, considering the construction concomitant therewith, takes them out of the narrow claims of patent 927. I therefore find that Claim 3 of patent 927 is not infringed by the accused devices.

Similarly, Claim 4 of patent 927 calls for the formation of a conduit for the carriage of a stream of air between a shell which serves as *supporting means for the mixing means* and the outside body of the aerator, "said shell terminating in an upstream direction above and adjacent to the upstream side of the mixing means." As I have found that the mixing means in the accused devices is the mushroom-shaped plug, and that the plug is supported *not* by a shell around its periphery (as is called for by Claim 4), but, rather, is supported by its attachment to the jet-forming means, I find that Claim 4 of patent 927 is not infringed by the accused devices.

Claim 7 of the 927 patent is allegedly infringed by the Exhibit B aerator (brass model). It calls for a chamber (the aerator body) "defining indents along its inner side wall for allowing passage of air from its discharge end along its inner side wall *to the space between* the jet-forming means and the mixing means." (Emphasis added). It is clear that the air passages formed by the indents in the accused Exhibit B aerator do not have their upper termini at the space between the jet-forming means and the mixing means, which space would be, by definition, in light of my findings discussed, *ante*, the space between the perforated diaphragm and the mushroom-shaped plug. Indeed, the the air passages formed by the indents and the inner side wall of the accused Exhibit B device terminate well below the space between the jet-forming means and the mushroom-shaped plug in said device.

Claim 8 of patent 927 calls for the creation of an air inlet space between a "second unit," containing the mixing means and the shell of the aerator, thereby permitting air to enter from the bottom of the aerator "and then pass inwardly adjacent the mixing means *to the space above the mixing means* . . . ." It is the conclusion of this Court that in the accused devices, the air inlet passageways formed between the shell of the aerator and the lower internal mechanism thereof (containing the stream-forming screen) terminate *below* the mixing means, the air thus brought in being sucked up into the mixing means by dint of the operation of the Venturi principle. Therefore, we conclude that Claim 8 of patent 927 is not infringed by the accused devices.

Claim 17 of patent 927 is virtually the word-for-word equivalent of rejected claim 20 of application 351,907, calling for supporting means for the mixing means defining a water passage "containing said mixing means," said supporting means also defining "between the mixing means and the inner wall of the conduit an air passage." I conclude that the supporting means for the mixing means in the accused devices is the jet-forming means, inasmuch as the mixing means is attached thereto as a part of the same molding thereof, and, consequently, that the supporting means in the accused devices clearly does not *contain* the mixing means, but, on the contrary, is upstream thereof. Further, in view of this conclusion, it is also my finding that the supporting means in the accused devices does not define an air passage between the mixing means and the inner wall of the conduit, since the supporting means in the accused devices is not the plastic basket or white metal washer, but is the jet-forming means itself. Consequently, Claim 17 is not infringed by the accused devices.

Although the claims discussed above, *viz.*, 3, 4, 7, 8 and 17, were the ones relied upon at trial as representative of the claims of the 927 patent allegedly infringed by the accused devices, the pretrial order in this case provided that claims of infringement were being asserted as to the following additional claims: with respect to Exhibit A (plastic model): Claims 1, 5, 6, 10, 11, 12, and 13; and with respect to Exhibit B (brass model): Claims 6, 18 and 19. Therefore, I shall briefly state my opinion as to why the accused devices do not infringe these claims:

1. Claim 1 is not infringed insofar as the accused device *does not* have an air passageway between the transverse means and the inner side wall which extends *past the mixing means* and which communicates with the mixing space adjacent to the *upstream side* of the mixing means. The air passages in the accused device clearly terminate below the upstream end of the mixing means.

2. Claim 5 is not infringed insofar as the accused device *does not* have an air passageway in the supporting means for the mixing means which passageway extends *past* the mixing means to the space between the jet-forming means and the mixing means.

3. Similarly, Claim 6 is not infringed by either of the accused devices insofar as neither of them has a mixing means which has indents along its outer wall. The mixing means in the accused devices is, of course, the plug which, by virtue of its physical properties, obviously has no "outer wall," much less indents thereon.

4. We may dispose of claims 10 through 13, inclusive, insofar as they all refer back for basic design concept and details of air passageway construction (particularly the length or extent thereof) to either Claim 1 or Claim 5, neither of which, I have concluded, is infringed by the accused devices. Claims 10 through 13 merely incorporate additional details of construction pertaining solely to the mixing means and the means of its support, which are not infringed in any event by the accused Exhibit A insofar as its mixing means is not supported in the same fashion as are the Aghnides screen-type downstream mixing means contemplated and described in claims 10 through 13, inclusive.

5. Claims 18 and 19, claimed to be infringed by the Exhibit B aerator, incorporate by reference Claim 17, which we have found not to be infringed by the accused devices. Claims 18 and 19 relate merely to details of construction for the support of the mixing means in the Claim 17-type aerator, which details are not infringed in any event by the accused aerator due to the fact that the downstream screen in the accused device is not the mixing means thereof.

It is, in sum, my conclusion that none of the claims of U.S. Patent No. 2,998,927 are infringed by the accused Woolworth devices.

This court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in the aforegoing opinion, whether or not expressly so characterized.